The ASHLAND OIL COMPANY OF
CALIFORNIA, Plaintiff,

v.

The FEDERAL ENERGY ADMINIS-
TRATION et al., Defendants.

No. C–75–0082 WHO.

United States District Court,
N. D. California.

Feb. 12, 1975.

H. Lee Evans, Evans, Farber & Froneberger, San Francisco, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., John D. O'Connor, Asst. U. S. Atty., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

ORRICK, District Judge.

### MEMORANDUM

Plaintiff, The Ashland Oil Company of California (Ashland), a nonbranded, independent, wholesale supplier of gasoline, seeks a preliminary injunction restraining defendants, The Federal Energy Administration, William D. Arntz, Regional Administrator, Region IX, and Jerald Scheinberg, Director of Operations Division, Region IX (reference to "the FEA" throughout includes all defendants), from implementing its order of January 10, 1975, withdrawing Ashland's gasoline supply and gasoline customers and reassigning Ashland's gasoline customers to nine major oil refiners. Plaintiff, Ashland, also seeks a declaratory judgment declaring that the FEA acted in excess of its authority when it issued the order of January 10, 1975.

The jurisdiction of the Court to consider Ashland's motion is properly invoked under the Emergency Petroleum Allocation Act of 1973 (the 1973 Allocation Act) (P.L. 93–159), the Emergency Petroleum Allocation Act of 1974 (the 1974 Allocation Act (P.L. 93–275) and the accompanying regulations which govern the FEA. 10 C.F.R. § 205 et seq.

Under Section 706 of the Administrative Procedure Act (5 U.S.C. § 706(2)), this Court has the authority to review actions of the FEA and to set aside any agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The matter came on regularly for hearing on January 30, 1975. The Court having considered the oral argument, the memoranda and pleadings on file in this action, plaintiff's motion for injunctive relief is granted in part and denied in part.

## I. FACTS

### A. *Background of the Allocation Acts*

The 1973 and 1974 Allocation Acts were passed in response to the "energy crisis" which confronted the United States in the latter part of 1973. Under the authority of the 1973 Allocation Act, the President was given broad powers to minimize the adverse impact of the energy shortages (P.L. 93–159 § 2(b)). By Executive Order, the President established the Federal Energy Office and delegated to it the responsibility of establishing a distribution system for gasoline (Executive Order 11748, 38 Fed. Reg. 3375 (1973)). By a subsequent Executive Order, the powers of the Federal Energy Office were transferred to the FEA (Executive Order 11790, 30

Fed.Reg. 23185 (1974)). The FEA is now responsible for regulating gasoline supplier, wholesaler, and retailer relations and for determining the volume of gasoline each member of the distribution chain is to be allocated.

Since 1972 was the last year in which there was a normal distribution of petroleum products without any shortages, the FEA regulations rely on the 1972 purchases as a base period for calculating on-going gasoline distribution. Under the regulations, all suppliers must supply the wholesale purchasers they serviced in 1972 (10 C.F.R. § 211.9),[1] unless the FEA reallocates suppliers and purchasers (10 C.F.R. § 211.12(e)).[2] The suppliers are required to distribute available petroleum products among all

---

1. 10 C.F.R. § 211.9:

"*Supplier/purchaser relationships.*

(a) *Supplier/wholesale purchaser relationship.* (1) Each supplier of an allocated product shall supply all wholesale purchaser-resellers and all wholesale purchaser-consumers which purchased or obtained that allocated product from that supplier during the base period as specified in Subparts D through K of this part.

(2) (i) Unless otherwise provided in this part or directed by FEO, the supplier/wholesale purchaser-reseller relationships defined by specific dates or base periods or otherwise imposed pursuant to this part shall be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be waived or otherwise terminated without the express written approval of FEO.

(ii) Unless otherwise provided in this Part or directed by FEO, the supplier/wholesale purchaser-consumer relationships defined by specific dates or base periods or otherwise imposed pursuant to this part shall be maintained for the duration of the Mandatory Petroleum Allocation Program and may not be revised or otherwise terminated except that any such relationship may be terminated by the mutual consent of both parties.

(b) *Supplier/end-user relationship.* Each supplier of an allocated product shall, to the maximum extent practicable, supply all end-users which purchased that allocated product from that supplier as of January 15, 1974, and which are entitled to an allocation level under the provisions of Subparts D through K of this part.

(c) *Changes in ownership or brand.* The supplier/purchaser relationships required by this part shall not be altered by (1) changes in the ownership or right of possession of the real property on which a wholesale purchaser or end-user maintains its on-going business or end use; or (2) changes in the brand or franchise under which a wholesale purchaser-reseller maintains its on-going business.

(d) *New relationships.* (1) Suppliers shall not supply new wholesale purchasers except in accordance with § 211.12(e).

(2) Suppliers shall not supply new end-users except in accordance with § 211.-12(f).

(3) New suppliers shall not supply wholesale purchasers or end-users except in accordance with § 211.10(e).

(e) *Dual capacities.* A supplier may act in the capacity of a wholesale purchaser and an end-user. A wholesale purchaser-consumer may also be a wholesale purchaser-reseller. A firm which is acting in one or more different capacities shall comply with the appropriate regulations governing each capacity in which it acts."

2. 10 C.F.R. § 211.12(e) deals with purchaser's allocation entitlement and provides in pertinent part:

"(5) Any purchaser which is assigned to or accepted by a supplier under the provisions of this paragraph shall be accepted by the supplier for the duration of the program or until otherwise directed by the FEA."

purchasers served during 1972 on a pro rata basis (10 C.F.R. § 211.10).[3]

B. *Ashland's Relations With the FEA*

Ashland is subject to FEA regulation and depends on an FEA assignment for a gasoline supply. In January, 1974, at the beginning of the allocation program, Ashland, having experienced difficulties with its supplier, Coastal States Gas Producing Company (Coastal), applied to the FEA for a change in gasoline suppliers. During 1974, Ashland repeatedly renewed its requests for a change in suppliers. The FEA considered Ashland's request and monitored Ashland-Coastal relations during 1974, but took no definite action on Ashland's application until December 19, 1974. On this date, the FEA issued a proposed order directing nine major oil refiners to supply Ashland's gasoline allotment requirements. This order became final December 31, 1974, and was to go into effect on January 1, 1975. For the first few days of January, Ashland experienced difficulty in meeting its obligations to its customers. The FEA reviewed Ashland's storage facilities and Ashland's

financial status, found them to be inadequate, and revised its December 31 order. On January 10, the FEA issued a new temporary order which rescinded the December 31 order, which had directed the nine oil refiners to supply Ashland with motor gasoline, and instead ordered the nine major oil refiners to supply Ashland's customers directly. By this January 10 order, the FEA withdrew Ashland's gasoline allotment. Ashland contends that this FEA action was in excess of statutory authority and denied Ashland a property right without due process or just compensation.

## II. DID ASHLAND MEET THE STANDARDS FOR INVOKING JUDICIAL REVIEW AND FOR OBTAINING INJUNCTIVE RELIEF?

A. *To Invoke Judicial Review, Was Ashland Required Under the Circumstances of the Case at Bar to Exhaust Its Administrative Remedies?*

Preliminarily, the Court must consider whether Ashland is precluded from seek-

---

3. 10 C.F.R. § 211.10 provides in pertinent part:

"(b) *Allocation fraction.* Each supplier shall determine an allocation fraction prior to making any allocation. A supplier's allocation fraction for any period which corresponds to a base period for an allocated product shall be equal to its allocable supply of that product, which is defined in paragraph (b)(1) of this section, for that period, divided by its supply obligation for all levels of distribution, which is defined in paragraph (b)(2) of this section. Suppliers shall adjust their allocation fractions for each such period to reflect adjustments in their supply obligation and in their allocable supply. Each supplier shall only have a single allocation fraction for all purchasers except to the extent permitted in § 211.14 or unless permitted or required by order of the FEO. Suppliers with two or more distribution subsystems or regions independent of one another may apply to the FEA National Office, in accordance with Subpart G of Part 205 of this chapter, for permission to use multiple allocation fractions whenever use of a single allocation fraction would be impracticable or inconsistent with the objectives of the program.

(1) *Allocable supply.* Each supplier's allocable supply of an allocated product for a period which corresponds to a base period shall be equal to its total supply for that period, which is the sum of its estimated production, including amounts received under processing and exchange agreements, imports, purchases and any reduction in inventory of that allocated product made pursuant to § 211.22 except as otherwise ordered by FEO; less (i) any amounts designated as a state set-aside for a prime supplier pursuant to § 211.17, (ii) any amounts of allocation requirements supplied directly to end-users or wholesale purchaser-consumers under an allocation level not subject to an allocation fraction, (iii) any amounts supplied to wholesale purchaser-resellers which have certified these amounts to be for ultimate use under an allocation level not subject to an allocation fraction, and (iv) any amounts supplied to customers through exchange agreements. Any existing inventory, or production, importation or purchase of an allocated product used to increase that inventory consistent with the provisions of § 211.22 shall not be included in the allocable supply of that product."

ing judicial review of the FEA action because it has failed to exhaust available administrative remedies. American Nursing Home Association v. Cost of Living Council, 497 F.2d 909, 913 (T.E. C.A.1974). There were several administrative remedies available to Ashland. For example, Ashland could have applied for a stay pending appeal (10 C.F.R. § 205.120),[4] could have appealed the FEA order of January 10 (10 C.F.R. § 205.-100),[5] or could have submitted comments on the proposed FEA order (10 C.F.R. § 205.33).[6]

■■ Although Ashland did not pursue any of these avenues for relief, I find that Ashland was not required to exhaust the available administrative remedies before instituting this action. The purpose behind the exhaustion doctrine is to provide the Court with a factual record based on an agency hearing where the issues involved require agency expertise. In the case at bar, however, Ashland raises claims that the FEA act-

ed in excess of its administrative authority when it withdrew Ashland's gasoline allocation and customers. Ashland further claims this FEA action constituted a taking without due process and without just compensation in violation of the Fifth Amendment. It is clear that where constitutional questions are raised and the construction of a statute is at issue, the expertise of a court, not of an agency, is needed, and a party is not required to exhaust administrative remedies. Salfi v. Weinberger, 373 F. Supp. 961 (N.D.Cal.1974).

### B. Did Ashland Meet the Standards for Obtaining Injunctive Relief?

■ In evaluating Ashland's motion for a preliminary injunction, the Court must consider Ashland's probability of success on the merits; whether Ashland will be irreparably injured if injunctive relief is denied; whether the maintenance of the status quo will be affected by the equitable relief; and the public

4. 10 C.F.R. § 205.120:
   *"Purpose and scope.*
   This subpart establishes the procedures for the application for and granting of a stay by the FEA. An application for a stay will only be considered—
   (a) incident to or pending an appeal from an order of the FEA;
   (b) incident to an application for an exception from the application of any FEA regulations, rulings, or generally applicable requirements when the stay sought is of the same regulation, ruling or generally applicable requirement from which the exception is sought; or
   (c) pending judicial review.
   All FEA orders, regulations, rulings, and generally applicable requirements shall be complied with unless and until an application for a stay is granted."

5. 10 C.F.R. § 205.100:
   *"Purpose and scope.*
   (a) This subpart establishes the procedures for the filing of an administrative appeal of FEA actions taken under Subparts B, C, D, E, F, G, or O of this part or Subpart I of Part 212 and the consideration of such appeal by the FEA. Appeals of orders issued by State Offices shall be in accordance with Subpart R.
   (b) A person who has appeared before the FEA in connection with a matter aris-

ing under Subparts B, C, D, E, F, G or O of this part or Subpart I of Part 212 has not exhausted his administrative remedies until an appeal has been filed under this subpart and an order granting or denying the appeal has been issued."

6. 10 C.F.R. § 205.33:
   *"Notice.*
   (a) The FEA shall serve notice on any person readily identifiable by the FEA as one who will be aggrieved by the FEA action and may serve notice on any other person that written comments regarding the application for assignment will be accepted if filed within 10 days of service of the notice; or may determine that notice should be published in the *Federal Register.*
   (b) Any person submitting written comments to the FEA with respect to an application filed under this subpart shall send a copy of the comments, or a copy from which confidential information has been deleted in accordance with § 205.-9(f), to the applicant. The person shall certify to the FEA that it has complied with the requirements of this paragraph. The FEA may notify other persons participating in the proceeding of such comments and provide an opportunity for such persons to respond."

interest in granting or denying the relief. 7 J. Moore, Federal Practice ¶ 65.-04(1) (2d ed. 1948).

### 1. Ashland's Probability of Success on the Merits

In considering the likelihood of Ashland's eventual success on the merits, I find that Ashland has a strong likelihood of ultimately establishing that the FEA acted beyond the scope of its authority when it withdrew Ashland's gasoline entitlement. Section 211.11[7] of the FEA regulations (10 C.F.R.) is the only section of the regulations dealing with the withdrawal of an allocation of gasoline. Section 211.11 establishes a right to receive a gasoline allocation based on 1972 base period purchases. Section 211.11(d) provides in pertinent part: " * * * the right to receive an allocation shall not be assignable separately, but shall be considered an integral part of the on-going business * * *. *The right to an allocation shall be deemed to have been transferred only when the entire business or activity of the firm is transferred to a successor firm.*" (Emphasis added.)

Under Section 211.11 the loss of entitlement to an allocation is justified when a wholesale purchaser is going out of business and for no other reason.

■ On January 10, 1975, Ashland was not going out of business although it was having difficulty in fulfilling its obligations. Thus, the FEA did not have authority under the regulations to rescind Ashland's right to receive an allocation of gasoline.

The FEA contends that the January 10 redistribution of customers was authorized under the temporary assignment provisions of the regulations (10 C.F.R. § 205.39)[8] and the purchaser-sup-

---

7. 10 C.F.R. § 211.11:
   "*Basis for purchaser's entitlement to allocation.*
   (a) *Basis of entitlement.* A wholesale purchaser or an end-user entitled to an allocation level shall receive an allocation based on its conduct of an on-going business or maintenance of an established end use.
   (b) *End-users and wholesale purchasers as a firm.* (1) For purposes of defining an end-user or wholesale purchaser-consumer in this part, a firm shall mean all parts of the parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls which act as ultimate consumers including all sites, storage tanks and other facilities or entities of the end-user or wholesale purchaser-consumer that utilize or store an allocated product.
   (2) Except as provided in Subpart F of this part, for purposes of defining a wholesale purchaser-reseller in this part, a firm shall mean all parts of the parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls.
   (c) *Loss of allocation entitlement for going out of business.* Wholesale purchasers and end-users which have gone out of business shall not be eligible for allocations based on volumes received or

purchases made prior to going out of business.
   (d) *Transfer of entitlement.* The right to receive an allocation shall not be assignable separately but shall be considered an integral part of the on-going business or established end use. The right to an allocation shall be deemed to have been transferred only when the entire business or activity of the firm is transferred to a successor firm."

8. 10 C.F.R. § 205.39:
   "*Temporary assignment.*
   (a) In certain circumstances and upon application, the FEA may issue a temporary assignment order to certain wholesale purchaser-resellers and to wholesale purchaser-consumers or end-users with a requirement for an allocated product for which there is not a state set-aside, or who, in accordance with Part 211 of this chapter, must submit applications for assignment to the National FEA. Those end-users, wholesale purchaser-consumers and wholesale purchaser-resellers requesting an assignment to meet the needs of end-users and wholesale purchaser-consumers experiencing hardship or emergency requirements with respect to products for which there is a state set-aside (products in the state set-aside are identified in § 211.17(a)) shall apply to the appropri-

plier allocation provision (10 C.F.R. § 211.12(e)). Section 205.39 of the FEA regulations (10 C.F.R.) allows for an immediate and temporary assignment of suppliers and purchasers to meet dire circumstances. While these temporary reassignment provisions may have justified the reassignment of Ashland's customers to the nine major oil refiners if the customers requested the reassignment and the FEA found that dire circumstances necessitated an immediate change, Section 205.39 does not justify the withdrawal of Ashland's gasoline entitlement.

The government further contends that once the "historical" supplier for a gaso- line wholesaler has been changed by the FEA in response to an application for a change of supplier, the wholesale customer then loses its statutory right to an entitlement based on 1972 base period purchases and is only entitled to a gasoline allotment if the FEA can locate a surplus supply. The government has been unable to point to any provisions in the regulations to authorize this practice. The Court, having independently studied the regulations, has not found any such provisions and has serious doubts as to the validity of any such theory.

Nor does Section 211.12(e) justify the loss of the gasoline entitlement. Section

ate State Office for an assignment from the state set-aside system, in accordance with Subpart Q of this part.

The ordering of a temporary assignment shall occur only in dire circumstances and when it is not feasible to issue an assignment order that conforms to the FEA guidelines, including, but not limited to, the requirement that assignment orders for a month be issued, to the maximum extent possible, by the 15th of the preceding month. Temporary assignments are intended to be issued when circumstances do not permit the issuance of an assignment order in the normal time period, i. e., prior to the 15th day of the month preceding the month for which there is the requirement for the assignment. Thus, a temporary assignment is an 'off-phase' order. The 'Application for Temporary Assignment' is to conform to the requirements of § 205.34, except that such requirements may be waived in whole or in part by the FEA for good cause shown. The application shall fully describe why the assignment must be made out of phase with the normal issuance of assignment orders. A temporary assignment order shall have a duration of not longer than 60 days. It is intended that a temporary assignment order shall be a one-time order that pertains to a specific situation, and it may not be extended by issuance of another temporary assignment order. If the applicant anticipates the requirement for an assignment of longer than 60 days duration, he shall submit contemporaneously with the application for a temporary assignment, or as soon thereafter as feasible, an 'Application for Assignment.'

(b) A temporary assignment order shall conform to the requirements of § 205.35 and shall be issued only upon a finding that circumstances do not permit issuance of an assignment on-phase with the processing of assignment orders in accordance with FEA guidelines, which finding shall be stated in the order.

(c) Notwithstanding the provisions of § 205.35(b)(3), § 211.29 and Special Rule No. 1 issued thereunder, upon application by a synthetic natural gas manufacturer and upon a finding that circumstances do not permit the issuance of an assignment order in accordance with the criteria set forth in § 211.29 and Special Rule No. 1 issued thereunder because additional testing and/or data are required in order to determine if those criteria are met, which finding shall be stated in the order, a temporary assignment order may be issued. Notwithstanding the provisions of paragraph (a) of this section, a temporary assignment order issued on behalf of a synthetic natural gas manufacturer may be extended for a period not to exceed 30 days upon a finding that such extension is required in order to complete the testing and/or collection of data which occasioned the initial order, which finding shall be stated in the extension. No more than one such extension may be issued respecting a given temporary assignment and in no event shall a temporary assignment order pertaining to a specific situation cover a total period of more than 90 days.

(d) The supplier selected shall be given notice of the temporary assignment order at least 24 hours in advance of its issuance. Notwithstanding the provision for notice to third persons in § 205.33, the FEA may make a decision on an application for temporary assignment prior to the receipt of written comments.

(e) A temporary assignment order shall be appealable in accordance with § 205.38 of this subpart."

211.12 deals with supplier-purchaser relations. Under this section the FEA shall continue any existing supplier-purchaser relation "to the extent practicable" (§ 211.12(e)(3)(i)) and any purchaser assigned to or accepted by a supplier under the provisions of the section shall be accepted for the duration of the program or until otherwise directed by the FEA (§ 211.12(e)(5)). This section of the regulations gives the FEA the power to redistribute supplier-customer allocations and reshuffle supplier-customer relations, but it does not give the FEA authority to totally deny a supplier, such as Ashland, its gasoline entitlement. Section 211.11 is the only section of the regulations that deals with the loss of entitlements. Under Section 211.11, a loss of entitlement is justified when a supplier is going out of business. This requirement for a loss of entitlement was not present on January 10, when the FEA withdrew Ashland's gasoline entitlement.

Since the FEA has acted in excess of its authority and has failed to comply with the terms of its own regulations, it is not necessary for the Court to reach the constitutional question of whether Ashland was denied due process when its entitlement rights were withdrawn without a hearing and without compensation.

### 2. *The Equities*

■ Examining and balancing the equities, the FEA argues that the public interest and the interest of Ashland's customers will not be served if Ashland is placed back in the gasoline distribution chain since Ashland has not shown it can fulfill its obligations. However, I find that the public has an interest in protecting the independent gasoline suppliers such as Ashland. Indeed, this was one of the motivations behind the 1973 and 1974 Allocation Acts. Section 4(b)(1) of the 1973 Allocation Act provides that the FEA "to the maximum extent practicable" shall:

"* * * preserve the competitive viability of independent refiners,

small refiners, nonbranded independent marketers, and branded independent marketers."

It is true that the Allocation Acts were also passed to protect Ashland's thirty independent customers. Under the FEA regulations, Ashland's customers will be protected if Ashland is returned to the gasoline supply chain. If Ashland cannot meet its supply obligations, the customers are free to request a reassignment of suppliers under either the regular or emergency temporary reallocation provisions of the regulations.

■ Moreover, in balancing the equities, I find that the FEA unjustly delayed making any ruling on Ashland's application for a change of suppliers. Ashland filed its application for a change in suppliers a full year prior to the FEA's December 31 order reassigning the nine major oil refiners to supply Ashland. During the course of 1974, Ashland repeatedly renewed its request for a reassignment of supplier. The FEA did not take any definitive action on this application until December 31, 1974. This delay in processing Ashland's request exacerbated several of the start-up problems experienced by Ashland in the early days of January since, as a result of the FEA's delay, Ashland had only a brief period of time to arrange the details of the new supply operations.

### 3. *Ashland Would Suffer Irreparable Injury*

■ I find that Ashland would be irreparably injured if the FEA were not enjoined from enforcing its January 10, 1975, order. Ashland has virtually been put out of business by the FEA action. Both its suppliers and its customers have been removed as a consequence of the January 10 reassignment order.

### 4. *Status Quo*

■ Finally, I find that the *status quo* would best be preserved by enjoining the enforcement of the January 10, 1975, order. In determining what state

of affairs constitute the *status quo*, I must look to the last peaceable state between the parties which preceded the present controversy. Washington Basketball Club Inc. v. Berry, 304 F.Supp. 1193 (N.D.Cal.1969). In the case at bar, the last peaceable state existed under the terms of the FEA's December 31 order. Under this order, Ashland was entitled to its gasoline entitlement.

I find that the FEA did not have authority to withdraw Ashland's gasoline entitlement and, therefore, I grant in part plaintiff's motion for a preliminary injunction and enjoin the FEA from enforcing its order made on January 10, 1975, withdrawing the assignment of nine major suppliers to Ashland and reassigning the customers of Ashland to other suppliers.

I deny plaintiff's motion that the FEA be ordered to return to Ashland all the customers it serviced as of December 31, 1974. In so doing, I make no ruling prohibiting the FEA from reassigning any of Ashland's customers who petition for a change in supplier and whom the FEA deems would best be served by such a change. Nor do I make any ruling prohibiting the FEA from maintaining any reassignments of Ashland's customers that have already been made under the temporary assignment provisions of the regulations.

### ORDER

It is hereby ordered that the FEA will reinstitute Ashland's gasoline allotment in the amount to which Ashland is entitled under the regulations based on its 1972 base period.

It is further ordered that the FEA will reassign Ashland to a gasoline supplier or gasoline suppliers.

It is further ordered that plaintiff, Ashland, will post a bond of $2,500 to cover any future costs that may be incurred by the FEA.

It is further ordered that pursuant to Rule 52 of the Federal Rules of Civil Procedure this Memorandum Opinion and Order constitute my findings of fact and conclusions of law in this action.