**SHELL OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**CITIES SERVICE OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**PUBLIC SERVICE COMMISSION FOR the STATE OF NEW YORK, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

Nos. 73–1329, 73–1763, 73–2028.

United States Court of Appeals,
Fifth Circuit.

March 14, 1974.

Rehearing Denied April 15, 1974.

Sam H. Riggs, Jr., Clark A. Halderson, Tulsa, Okl., for petitioner in 73–1763.

Leo E. Forquer, Gen. Counsel, Federal Power Commission, George W. McHenry, Jr., Acting Sol., Michael J. Manning, Atty., John R. Staffier, FPC, Washington, D. C., for Federal Power Commission.

Homer D. Johnson, William C. Charlton, Pampa, Tex., for intervenors (for petitioner) in 73–1763.

John E. Holtzinger, Jr., Frederick Moring, Washington, D. C., for Associated Gas Distributors.

Richard F. Generelly, Washington, D. C., John T. McMahon, Houston, Tex., for Ashland Oil Co.

Carroll L. Gilliam, Philip R. Ehrenkranz, Washington, D. C., for Mobil.

Robert D. Haworth, Houston, Tex., for Mobil Oil Corp. in 73–1763.

Thomas G. Johnson, Dan A. Bruce, William G. Riddoch, Houston, Tex., E. M. Sutter, New Orleans, La., for petitioner in 73–1329.

Robert D. Haworth, James T. Nesbitt, Houston, Tex., for Mobil Oil Corp., in 73–1329.

David G. Stevenson, Tulsa, Okl., for Amerada Hess Corp.

Ronald J. Jacobs, Tulsa, Okl., for Skelly Oil Co.

Kenneth Heady, John L. Williford, Bartlesville, Okl., for Phillips Petroleum Co.

T. C. McCorkle, Chicago, Ill., for Amoco Prod. Co.

Edward J. Kremer, Jr., William J. Bonner, Dallas, Tex., for Atlantic Richfield Co.

J. Donald Annett, Washington, D. C., Kirk W. Weinert, John M. Young, C. Fielding Early, Jr., Houston, Tex., for Texaco, Inc.

Richard A. Solomon, Washington, D. C., for petitioner in 73–2028.

E. W. Cole, Washington, D. C., for Union Oil Co. of California.

Martin L. Friedman, Washington, D. C., for Phillips Petroleum Co.

Thomas G. Johnson, Houston, Tex., for Shell Oil Co.

Robert D. Haworth, Tom P. Hamill, Houston, Tex., for Mobil Oil Corp. in 73–2028.

Before GEWIN, THORNBERRY and COLEMAN, Circuit Judges.

THORNBERRY, Circuit Judge:

In 1954 the Federal Power Commission began its search for a solution to the baffling puzzle of producer regulation.[1] In 1965 it settled on area ratemaking and contract vintaging.[2] But after ten years gas demand continues to outstrip supply, and the producer regulation problem remains unsolved. This case marks the beginning of a new phase in the continuing effort to hit upon a ratemaking technique that will bring the gas supply in line with consumer demand.

■ This petition for review comes to us in a most unusual posture. All the parties, including FPC, agree that the rates set in the Appalachian and Illinois Basin Area[3] (AIBA) were satisfactory for only slightly more than a year and now are obsolete. But the parties' harmony ends there, and the pricing problem's solution is hotly disputed. The petitioners have suggested a new area rate proceeding and a third "vintage" of gas prices. To their dismay and disbelief, in Opinion 639[4] FPC not only rejected their suggestions but went on virtually to abandon the concepts of area pricing

and contract vintaging.[5] We affirm the Commission's decision.

I.

This case is the product of gas company dissatisfaction with FPC's Order No. 411,[6] which set area rates for gas produced in AIBA. The order was issued October 2, 1970, and never appealed. Less than sixteen months later, however, Iroquois Gas Corporation, Pennsylvania Gas Company, United Natural Gas Company, and Columbia Gas Transmission Corporation formally complained that Order 411's rates were too low. Their petition requested FPC to amend its regulations[7] by establishing a third, higher priced vintage for AIBA gas sold after February 1, 1972.

The Commission considered this petition in an informal rulemaking proceeding that commenced with a notice issued June 19, 1972. Thirty-two parties responded to the notice with their written views of the rate revision request. On December 12, 1972, FPC in Opinion 639 denied the petitioners' request. That opinion is the subject of the instant appeal by the New York Public Service Commission (NYPSC) and a group of producers (collectively referred to as "Shell"), who were intervenors below.

On appeal petitioners attack two aspects of Opinion 639. Their first complaint is that FPC abused its discretion

---

1. In Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (*Phillips I*), the Supreme Court first held that FPC must regulate producers' wellhead gas sales to interstate pipelines.

2. Permian Basin Area Rate Proceeding, 34 FPC 159 (1965), aff'd sub nom., In re Permian Basin Area Rate Cases, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312.

3. Area Rates for the Appalachian and Illinois Basin Areas, Order No. 411, 44 FPC 1112 (1970).

4. Re Area Rate Proceeding for the Appalachian and Illinois Basin Areas, —— F.P.C. ——, 97 P.U.R.3d 289 (1972).

5. Vintaging by contract is the practice of pricing gas according to the date when the

contract for its production was signed. Area rate orders have used contract vintaging in establishing a two-tiered rate structure. All gas produced under contracts signed before a certain date is pegged at one price, while the gas produced under later contracts gets a higher price. *See, e. g.*, Area Rates for the Appalachian and Illinois Basin Area, Order No. 411, 44 FPC 1112 (1970). Theoretically the bifurcated pricing system encourages exploration and new production by granting a higher price for "new" gas.

6. Area Rates for the Appalachian and Illinois Basin Area, Order No. 411, 44 FPC 1112 (1970).

7. The AIBA rates are set forth as an FPC regulation and may be found at 18 C.F.R. § 154.107–8.

by recognizing the present area rates' inadequacy and refusing to amend them upward. The second objection is that FPC acted illegally and irrationally when it interpreted its prior rate orders' vintaging provisions in a manner that will phase out gas pricing by contract vintage.

## II.

We consider first FPC's refusal to amend area rates. At the outset we note that petitioners agree with FPC's fact findings. After measuring the effectiveness of curren area rates in AIBA the Commission found:

> On the basis of each of the general areas discussed above—national supply, area drilling and production activity, intrastate competition for new gas, the need for deep exploration, comparative costs, and changes in cost of service—we are persuaded that the rate structure provided in Order 411 is not a complete answer to the need of the consuming public for adequate and reliable supplies of new gas.

Thus FPC found that Order 411's rates are too low to ensure adequate gas supplies—but declined to make an areawide change.

The producer petitioners argue that FPC has drawn an illogical conclusion from its correct fact findings. In their view, if the area rates are inadequate, the logical remedy is to raise them. To do otherwise is to leave in effect unjust and unreasonable rates, and that constitutes an abuse of discretion. The petitioners recognize that the Supreme Court has granted FPC a liberal standard of review in area rate cases, but they argue that Opinion 639 is unjust and unreasonable in its consequences because it leaves in effect inadequate rates.

Because the impact of this aspect of Opinion 639 is to leave standing the area rate structure created by Order 411, we will examine it with the standard of review appropriate for rate orders. The Supreme Court has said that rate orders are to be approved unless their total effect can be called "unjust and unreasonable." We are concerned with the rates' consequences, not the method by which they are formulated. The Commission is not bound to a single ratemaking method or formula, and it is at liberty to make pragmatic adjustments in its methods. Its rate orders are the products of expert judgment and as such are presumed valid unless a petitioner can show the consequences will be unjust and unreasonable. In re Permian Basin Area Rate Cases, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312; FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.[8] *See* Austral Oil Co. v. FPC, 5th Cir. 1970, 428 F.2d 407, cert. denied, 400 U.S. 950, 91 S.Ct. 244, 27 L.Ed.2d 257 (*SoLa I*).

The next step is to review the Commission's position in light of the "unjust and unreasonable consequences" standard. Applying that standard to Opinion 639 convinces us that it does not leave the producers in such a hopeless situation that it will have unjust and unreasonable consequences. While it rejects area rate revision, it provides two alternative routes for seeking higher rates. We cannot say that foreclos-

---

8. In *Permian* the Supreme Court laid down three standards for reviewing rate orders. The order may not exceed the Commission's statutory authority; each essential element must be supported by substantial evidence; and the rates must be high enough to ensure a satisfactory return on the producers' investment. The third standard is not applicable here because the presently inadequate rates will likely be raised by the means FPC suggests in Opinion 639. The second is not applicable to the decision against raising area rates because no fact findings are disputed. We are concerned only with the first: statutory authority. The relevant statutory mandate in this case is to set "just and reasonable" rates. Natural Gas Act § 5(a), 15 U.S.C.A. § 717d(a). Hence we apply an "unjust and unreasonable" standard of review to FPC's refusal to raise area rates. *See* FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

ing one route to higher rates is necessarily unjust or unreasonable.

For gas produced from wells commenced after April 6, 1972, producers may seek rates above the area ceiling via the optional certification procedure provided in Order No. 455, 18 C.F.R. § 2.75. The Commission has set out eight tests to determine whether an Order No. 455 rate request meets the statutory standard of "just and reasonable":

(1) the contract rate in relation to other intrastate and interstate contract rates in that area, (2) the costs developed in recent area rate decisions, (3) increased costs since the close of hearing records, of which this Commission can take official notice, (4) the price of alternate fuels, (5) the supply-price-demand relationship, (6) capital formulation within the producing industry, (7) the consequences of our order upon the producing industry and (8) whether the order provides appropriate protection to the relevant present and future public interests.

Order Denying Application for Rehearing in Opinion 639, —— F.P.C. —— [Feb. 8, 1973].

Order No. 455 optional certification provides an avenue of relief for "new gas" producers who are willing to go outside the area rate structure. Opinion 639's second escape route, the departure from contract vintaging, is designed to give rate relief to producers desiring to stay within the area rate structure. It makes their "old" gas eligible for the higher current area rates by narrowly interpreting the contract vintaging provisions in existing area rate orders. When current production contracts ex-

pire, producers may contract with their customers to sell flowing gas at the higher current area rate for "new" gas.

Shell finds these relief opportunities inadequate and argues that FPC abused its discretion by refusing to raise area rates across the board. It maintains that Opinion 639 forces each producer individually to seek relief before the Commission, a return to the old case-by case-ratemaking approach that area regulation was intended to replace. With area rate revision unavailable, the "optional" procedure becomes mandatory in Shell's view, and the Commission will be hopelessly flooded with Order 455 rate requests. Shell believes that an individualized approach to ratemaking is unworkable, and the ultimate effect of the inevitable administrative nightmare will be to discourage new production.

■ Mindful of FPC's wide latitude in choosing a method of regulation, In re Permian Basin Area Rate Cases, *supra*, we cannot say it abused its authority in choosing optional individualized procedures over further area proceedings in the Appalachian and Illinois Basin Area. It gave sound reasons for disfavoring further use of the area method in AIBA. The rate structure optimistically promulgated in 1970 failed to stimulate production and elicit new gas supplies. Only a little more than a year passed before Order No. 411 faded into a premature obsolescence. Given that situation, the Commission perceived two alternatives: hold a new area rate proceeding that would either raise the existing rates or establish a third vintage for "new" gas, or else grant relief on an individual basis. It saw no reason why new area rates would fare any better than the old.[9] Consequently it es-

___

9. In Opinion 639 the Commission suggests that area ratemaking " . . . has not demonstrated sufficient flexibility to maintain a workable relationship between supply and demand, and . . . requires the use of noncurrent cost data." It suggests further that a uniform national rate is not "subject to these infirmities" and is under consideration as an alternative to area rates. We fail to see why area ratemaking necessarily is

more dependent on noncurrent cost data than nationwide ratemaking, but the Commission has left us with only conclusory statements concerning the failure of the area method. Despite the paucity of specific reasons why area regulation has failed, the worsening shortage of natural gas convinces us that the Commission is correct in concluding that it has failed to hit upon an adequate method of pricing that valuable resource. See Com-

chewed additional area ratemaking in AIBA in order to "avoid that which experience has shown to be futile."

We see no reason to force the Commission to continue using a regulatory tool that has proven to be unwieldy and unproductive. The wiser course is to allow the Commission to experiment further, in hopes that eventually it will find an acceptable method of pricing gas. We said in *SoLa II*:

> . . . [T]he thrust of *Permian* is that FPC is free to make an administrative determination which it believes will foster the most efficient and thorough regulation of natural gas rates. The method which it chose in *Permian* and *SoLa I* and *II* is the area rate method.

Placid Oil Co. v. FPC, 5th Cir. 1973, 483 F.2d 880, 912. Now FPC has decided to move on and try individualized procedures in lieu of the area rate method. Should this latest venture prove administratively unworkable, the Commission is free to try yet another method, perhaps uniform national rates.

### III.

Besides refusing to institute a new area rate proceeding that would establish a third vintage, the Commission interpreted Order 411 (and all rate orders with similar language) in a manner that eventually will eliminate contract vintaging.

> The wording of Order 411, and all other Commission area rate orders or opinions of similar import, stating that "old" gas rates will be applicable to "gas sold pursuant to a contract dated prior to October 8, 1969" will be literally and strictly applied. If a gas contract dated prior to October 8, 1969, *terminates,* and the purchaser and seller enter into a new contract,

gas sales under the new contract will be governed by the applicable pricing provisions relating to "gas sold pursuant to a contract dated after October 7, 1969." We will, thereby, simply adhere to the plain meaning of Order 411, and other orders and opinions with similar language, as written. In time this will result in the elimination of a two-price system, a result we believe intended by the original authors of vintaging and a result we wholeheartedly endorse.

NYPSC voices two primary objections to this construction of earlier area rate orders. First, it is illegal because it contradicts their intent. Second, it is irrational because it permits higher rates for flowing gas when there is no reason to believe producers will engage in new exploration and greater production in exchange for this act of FPC charity.

■ Before reaching the substance of FPC's vintaging statement, we must treat a halfhearted procedural objection raised by NYPSC. The complaint is that the vintaging statement is a basic modification of FPC regulations, and not the permissible interpretation it is advertised to be. Therefore the vintaging statement should have been preceded by notice and a hearing and supported by record evidence, in accordance with the rulemaking prerequisites set out in Section 4 of the Administrative Procedure Act.[10] We disagree with NYPSC's premise; we believe the vintaging statement is a permissible interpretation, not a basic modification of rate-setting regulations. It alters no existing rates, and, as discussed below, it fits the meaning of the regulations' language. Whether we characterize the statement as an interpretation or an interpretative rule,[11] notice, a hearing and a record were not required. Garelick Mfg. Co. v.

---

ment, 50 Texas L.Rev. 1370 (1972), in which the author chronicles the unhappy history of gas price regulation.

10. 5 U.S.C.A. § 553.

11. Section 4(a) of the A.P.A. provides, in pertinent part:
Except when notice or hearing is required by statute, this subsection does not apply—
(A) to interpretative rules . . .
5 U.S.C.A. § 553(b).

Dillon, 1963, 114 U.S.App.D.C. 917, 313 F.2d 899; Gibson Wine Co. v. Snyder, 1952, 90 U.S.App.D.C. 135, 194 F.2d 329. *See* 1 K. Davis, Administrative Law Treatise §§ 5.01–5.05.

We turn now to NYPSC's substantive objections. At the outset we note that a stricter standard of review is the concomitant of issuing an interpretation or interpretative rule instead of giving notice and holding a hearing. We will accord less deference to an interpretative rule than to a legislative rule. *Compare* Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124, *with* American Telephone & Telegraph Co. v. United States, 1936, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142. 1 K. Davis, Administrative Law Treatise § 5.03. Nonetheless, an agency's interpretation of its own regulations merits deference and will be upheld if it is reasonable and consistent with the regulation. Udall v. Tallman, 1965, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616; Bowles v. Seminole Rock & Sand Co., 1945, 325 U. S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700; Campbell Co. v. Wood Construction Co., 5th Cir. 1971, 446 F.2d 261.

In determining whether FPC has made a permissible interpretation, the first step is to determine whether its construction is consistent with the regulations' language. The interpretation is directed at those sections of area rate orders stating that "old gas" rates will be applicable to gas sold pursuant to a contract made prior to a certain date. Order 411 provides an example, limiting prices to:

(1) 30.75¢ for gas produced in the North subarea . . . and sold pursuant to a contract dated prior to October 8, 1969; and 32.75 ¢ for gas sold pursuant to a contract dated after October 7, 1969.

18 C.F.R. § 154.107(c)(1). We find this wording ambiguous. It could be read as putting a permanent ceiling on the price of gas for which a contract had been signed before the division date. Even if the contract expired, the prices on that gas would remain frozen because its original production contract had been signed before the cutoff date. Alternatively, a narrow interpretation of the same language would require the price to remain frozen only as long as a pre-division date production contract remained in force. FPC, of course, has chosen the latter construction. We cannot overrule the Commission because it has chosen one of two possible interpretations of its own ambiguous regulations.

FPC's interpretation will gradually discontinue the use of vintaging. That result does not appear to be inconsistent with the Commission's original plans for the two-price concept. Before any of the area rate proceedings had begun, Statement of General Policy 61–1, 24 FPC 818 (1960), established two levels of guideline prices for each of the various production areas. There was an "initial service rate" at which certificates would be issued for gas produced under new contracts, and a separate "increased rate" level for rate increase requests for gas already under contract. Thus this policy statement appears to be the origin of the two-price system based on contract date.[12] Significantly, in this policy statement the Commission indicated its intention eventually to use a unitary pricing system.

Two price standards are set for each area. Initial prices in new contracts are, and in many cases by virtue of economic factors, must be higher than the prices contained in old contracts. For this reason, we have found it ad-

---

12. NYPSC contends that the two-price system formulated in Statement of General Policy 61–1 has a rationale and method of operation so unlike the vintaging scheme written into the later area rate orders that one cannot call the 1960 statement the origin of the vintaging concept. As for rationale, we note that both systems express a recognition that producers' costs rise over time and necessitate a higher price for "new" gas. In regard to method of operation, both attempt to set "old" gas prices at a lower level and maintain a differential between the "old" and "new" levels.

visable to adopt two schedules of prices, one pertaining to initial prices in new contracts and one pertaining to escalated prices in existing contracts. *It is anticipated that these differences in price levels will be reduced and eventually eliminated as subsequent experience brings about revisions in the various areas.* (Emphasis supplied).

24 FPC 818 at 819. We conclude that FPC is acting consistently with its original views on vintaging by phasing out that concept with a narrow interpretation of its existing regulations.

NYPSC argues that because the new vintaging interpretation is irrational, it will produce results contrary to those intended by the original vintaging policy. FPC instituted vintaging to give producers a higher price for newly found gas as an incentive to new production, while avoiding producer windfalls by leaving flowing gas priced at frozen rates based on historical costs. But FPC's new interpretation of the vintaging provisions will produce a contrary result, we are told. With "new" and flowing gas at the same price level, the producers will have no incentive to find more gas because they can reap windfall profits by selling cheap flowing gas at the higher rate formerly reserved for "new" gas. If FPC required the producers to show higher costs or new production to justify the higher rate, then FPC would be acting rationally. But it is irrational only to raise gas rates with no *quid pro quo* required. The producers will not find increased production to be in their best interest, and, as NYPSC puts it, they will "take the money and run."

NYPSC's pessimism is understandable and may, in time, prove justified. It is true that producers who sign new contracts at the current area rates will find their "old gas" rate boosted by an increment greater than their cost increases. And it is possible, as NYPSC forecasts, that producers will reap the new high rates for their flowing gas without engaging in further drilling.

It is also conceivable, however, that a departure from vintaging will serve to increase gas production. In Opinion 639 the Commission stated it believes that vintaging actively discourages new drilling on acreage already committed to the interstate market. If a producer has signed a contract before the division date, all the gas he producers during the contract's life will receive the low "old gas" price. Even if he drills new wells at current costs, the "new" gas he discovers and produces will be priced as "old" gas, on the basis of historical costs computed in a year long since gone by. Since costs seem to rise inexorably with the passage of time, new drilling will become less attractive as the contract ages. For example, we think it quite likely that a producer operating under a 1964 contract may have little incentive to find expensive 1974 gas only to sell it at bargain 1964 rates. But if he can raise his prices to a uniform rate for both "new" and "old" gas when the old contract expires and a new one is signed, he might be more inclined to drill new wells.

If the higher rates do stimulate production, the extra increment for flowing gas will supply needed additional capital for exploration and drilling. Precedent, moreover, supports the view that FPC does not necessarily create an irrational windfall when it includes in the price of flowing gas an increment for further exploration and development. We approved in *SoLa II* a rate structure with just such an increment.

While we are fully aware that history may prove NYPSC's pessimistic prediction of producer behavior to be correct, we hold that FPC's interpretation of its regulations' vintaging provisions is rational, reasonable, and therefore fully permissible.

A caveat is appropriate at this point. In regard to vintaging, today we are approving FPC's interpretation of certain regulations. We do not reach the question of whether FPC may altogether discontinue the use of vintaging. Rather in each future rate order the

Commission must continue to produce substantial evidence to support each essential element of the proposed rate structure. In re Permian Basin Area Rate Cases, *supra*. Certainly the absence or presence of vintaging must be regarded as an essential element.

Having concluded that Opinion 639 does not produce unjust or unreasonable consequences, and that it expresses a permissible interpretation of area rate orders' vintaging provisions, we sustain the opinion in full.

Affirmed.