The STANDARD OIL COMPANY OF OHIO, an Ohio Corporation, Plaintiff-Appellee,

v.

FEDERAL ENERGY ADMINISTRA-TION, an agency of the United States of America, Frank G. Zarb, Administrator, Federal Energy Administration,

Gorman C. Smith, Acting Assistant Administrator, Operations, Regulation and Compliance, Federal Energy Administration,

Melvin Goldstein, Director, Office of Exceptions and Appeals, Federal Energy Administration, Defendants-Appellants,

and

United States of America, Counterclaimant-Appellant.

No. 6–22.

Temporary Emergency Court of Appeals.

Argued May 29, 1979.

Decided Sept. 13, 1979.

Rehearing and Rehearing En Banc Denied Nov. 6, 1979.

Arthur E. Gowran and C. Lee Allen, Dept. of Energy, Washington, D. C., were on brief, for defendants-appellants.

Charles F. Clarke, Squire, Sanders & Dempsey, Cleveland, Ohio, with whom B. Casey Yim and Frederick L. Fisher and George J. Dunn, Standard Oil Company, Cleveland, Ohio, were on brief, for plaintiff-appellee.

Before INGRAHAM, GRANT and LACEY, Judges.

LACEY, Judge.

The defendant Federal Energy Administration (FEA) appeals from a decision of

the district court that a Remedial Order and an Appeal Decision and Order issued by the FEA conflicted with regulations administered by the FEA and exceeded the scope of the FEA's authority.[1]  We affirm.

Plaintiff Standard Oil Company of Ohio (Sohio) is an independent refiner of petroleum products.  Before May 1973, Sohio bought its crude oil exclusively from domestic suppliers.  Because at that point domestic demand outstripped domestic supply, in May 1973 Sohio made arrangements to obtain a new source of crude oil by engaging in a "time-trade transaction."

The "time-trade transaction" worked in the following way.  Between May and December 1973, Sohio purchased from a domestic supplier and took delivery of large quantities of "sweet" domestic crude oil.  "Sweet" crude oil is a type of low-sulphur, relatively scarce, crude oil.  In consideration, Sohio paid $4.81 per barrel and also promised to deliver to the supplier an equal amount of the same quality oil at a set future date.  This was an arm's-length transaction and its legitimacy is not challenged.  In order that it would be able to comply with its obligation to deliver oil to its supplier in the future, Sohio in September 1973 contracted to buy foreign crude oil, to be paid for and delivered in February and March of 1974, at the price prevailing at the time of foreign oil delivery.

In the fall of 1973, due to the Arabs' oil embargo, the price of crude oil skyrocketed.  Sohio's bookkeeping reflected these increases: The crude oil invoiced in the transaction in suit, first carried at $4.81 per barrel in September 1973, was carried at $8.55 per barrel in October and $12.62 per barrel in November and December.  The higher costs carried on the books were the then current published world prices for crude oil;  thus, they did not necessarily reflect the price Sohio would eventually pay its foreign supplier in 1974 pursuant to the September 1973 contract.  Instead, they reflected Sohio's estimates of what it expected to pay in 1974.

The applicable regulations require that a refiner compute its prices by adding the lawful price of May 15, 1973 and the "increased product costs incurred between the month of measurement and the month of May 1973  .  .  .."  10 C.F.R. § 212.82(b).  Higher purchase prices for crude oil constitute one type of increased product costs.  Beginning in November 1973, Sohio took into account the new estimated costs of buying foreign oil in setting prices for consumers of its refined products.  That is, Sohio treated the anticipated expenses that would become due in February and March of 1974 as costs "incurred" for the purpose of determining prices in the fall of 1973.  At issue here is the propriety of calculating increased product costs on the basis of estimates rather than actual costs.

A controversy over treating costs as "incurred" before a final bill is presented and the total price is set and known exists as to the second transaction as well.  In November and December 1973 and January 1974, Sohio bought domestic crude.  Under the two-tier pricing system, "old" oil was subject to a ceiling price, but "new" oil could be sold at the prevailing market price, which, of course, was higher.  6 C.F.R.

---

1. The regulations at issue here were first promulgated by the Cost of Living Council under authority granted by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note.  Once the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 *et seq.,* was enacted in 1973, the Federal Energy Office (FEO) acquired responsibility for administering the regulations.  Without making substantive changes, the FEA republished and renumbered the regulations.  39 Fed.Reg. 1924 (Jan. 15, 1974).  Since then the regulations have undergone numerous changes.  Throughout this opinion the regulations will be referred to as they existed between October 1973 and February 1974, and the FEA's numbering will be used.  Upon the enactment of the Federal Energy Administration Act, 15 U.S.C. § 761 *et seq.,* responsibility for administering the regulations passed to the FEA.  The FEA became part of the Department of Energy on October 1, 1977.  42 U.S.C. § 7151(a); Executive Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977).  Since the FEA has been the agency with the greatest involvement in this litigation, this opinion will refer to the original defendants and their successors as the FEA.

§ 150.353–4.[2] Thus, when Sohio made these purchases domestic oil did not sell at a uniform price. The sellers of this crude oil invoiced Sohio at the "old" oil ceiling price, for they did not know at the time of sale how much was "old" and how much was "new" oil.

This made it impossible for Sohio when it received a shipment to know for sure the ultimate cost. Only later—sometimes as much as five months later—would the supplier ascertain the proportions of "old" and "new" oil and bill Sohio the true amount. Sohio, however, did not wait to get the suppliers' figures of the exact proportion of "new" and "old" oil before passing to its customers the higher price of the "new" oil. Based on production records, known "new" oil supplies, and industry reports, Sohio calculated the probable amount of "new" oil in a purchase, and then estimated the extra costs later to become payable and added those costs to its base price of May 1973. According to the FEA, using estimates violated the regulations. The FEA does not criticize the accuracy of the estimates or the manner of calculation.

On August 3, 1974 the FEA issued to Sohio a Notice of Probable Violation of the regulations. In that notice the FEA ordered Sohio to recompute its increased product costs in a way that excluded the higher prices anticipated from the "new" oil premium and the increase in foreign oil prices. Sohio was also ordered to submit a "plan outlining in detail the method by which Sohio will compensate for the effects of the violations . . .." Sohio replied on August 14, 1974, denying each of the alleged violations. On September 20, 1974 the FEA issued a Remedial Order finding that Sohio had committed the unlawful acts alleged in the Notice of Probable Violation. Sohio filed an appeal on October 2, 1974; it was denied on January 30, 1975. Sohio then filed suit in the Northern District of Ohio. The FEA counterclaimed, seeking compliance with its orders and civil penalties. Both sides moved for summary judgment. On November 20, 1978 the district judge entered judgment in favor of Sohio and against the FEA, holding that the Remedial Order was inconsistent with the governing regulations and exceeded the FEA's authority. This appeal is from that judgment.

■ The substantive issue before the court is a narrow one: Did the FEA exceed its authority in ordering Sohio to refund the money Sohio obtained when it estimated the future amounts that would have to be paid for oil purchased by it? In setting a price for its customers, Sohio treated its estimates of future payments as costs already incurred. For the "time-trade transaction" Sohio estimated the future cost of foreign crude oil based on the current world oil price; for the domestic oil purchases it estimated the proportions of "old" and "new" oil in each delivery. The FEA's position is that estimates are improper under the regulations because no costs are incurred until there is "a known obligation to pay a specific amount of money."

10 C.F.R. § 212.82(f) governs the permissible pricing of products by a refiner.

(1) General rule (i) The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1975, plus (a) increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 212.83 . . ..

The question is whether the FEA exceeded its authority in determining that under this regulation a cost is incurred only when known, or whether Sohio is correct in saying that the regulation permits estimating the future costs of present obligations.

2. The "two-tier" pricing system was originated by the Cost of Living Council during Phase IV of the Stabilization Program. The aim of the system was to minimize the inflation caused by higher worldwide prices, while still providing an incentive for increasing domestic produc- tion. "Old" oil could cost no more than the ceiling price of about $5.25 per barrel; "new" oil could be sold at the world market price. *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1394–95 (Em. App. 1975); *Exxon Corp. v. FEA*, 417 F.Supp. 516, 519 (D.N.J. 1975).

The plaintiff argues, and the FEA does not disagree, that a promise to pay in the future can be used in computing an "increased product cost." Indeed, at oral argument the FEA acknowledged that Sohio could have charged on the basis of the higher price if the higher price for February and March 1974 deliveries had been stated in the September contract. The conclusion that future costs can be regarded as having been "incurred" before actual payment takes place is reached in the following manner:

1) 10 C.F.R. § 212.83(b) defines "increased product costs" as "the difference between the total cost of crude petroleum during the month of measurement and the total cost of crude petroleum during the month of May, 1973." Thus, increased product cost is the difference between the total cost in the base period and the total cost in the month of measurement;

2) The cost of crude petroleum is defined, both for domestic and imported crude petroleum, as the "purchase price";

3) "Price" is defined by Section 212.31 as any consideration for the sale or lease of any property or service and includes rent, commissions, dues, fees, margins, rates, charges, tariffs, fares, or premiums, regardless of form.

Sohio contends that "any consideration . . . regardless of form" encompasses its promise to redeliver oil in the future or its promise later to pay the "new" oil premium.

The FEA has not challenged this position. Its opposition is directed at "estimates," no matter how well founded. The FEA does not argue that an obligation to pay in the future cannot be incurred cost under the regulations, rather that the promise to pay must be for a sum fixed and certain before it can be considered to have been "incurred." However, once it is conceded that future obligations are a form of "increased product costs"—which one must do if one

agrees that purchase price includes future obligations under 10 C.F.R. § 212.31—the analysis of the regulations becomes mechanical.

10 C.F.R. § 212.83(c)(1)(i) establishes the method for calculating "increased product costs incurred between the month of measurement and the month of May 1973." Despite the lengthy formula, only a few terms need be looked at to resolve the issue before the court. The allowable dollar increase in products for a month equals the sum of a number of terms, one of which is $A^t$. $A^t$ is "the total increased cost of crude petroleum purchased or landed in the period 't'." The period "t" is the month of measurement, i. e., the month in which Sohio's books reflected the estimated costs. $A^t =$ "the quantity of crude oil purchased or landed during the period 't'" times the difference between the cost per gallon in the month of measurement and the cost per gallon in May 1973. This, of course, verbally expresses how to compute increased product costs for a period, i. e., the quantity purchased times the increase in price.

Significantly, this formula defines $A^t$ (one of the terms used in computing allowable price increases for a month) as the cost of crude petroleum in the month of measurement. Because cost, as shown above, includes a promise to pay, and because a cost is incurred in the month of purchase, a promise to pay is a cost incurred in the month in which the promise is made. Restated, the regulations provide that a promise to pay is a price, a price is a cost, a cost is incurred in the month in which the crude oil is purchased, and a cost, once incurred, is used in computing "increased product costs." The purchase of the foreign oil took place in September 1973, not February and March of 1974; and the domestic oil was purchased in November and December 1973 and January 1974, not when Sohio learned, months later, of the total "new" oil premium.[3] The FEA does not argue to the contrary.

---

**3.** In the domestic transactions the cost was incurred in the same month that the premium was calculated. Thus, the increased product

cost estimate for the domestic transaction took place in the same month in which the cost was incurred. This is not true for the "time-trade

No regulation says a cost is incurred only if known. Indeed, the FEA admitted in answering interrogatories that "[n]o single provision of the price regulations specifies that a cost is incurred only when there is a known obligation to pay a specific amount of money." This suggests that several regulations when read together might have that meaning. Yet, the FEA's appellate brief provides no group of regulations that, when combined, supports the dual requirements of costs being both incurred and known.

Faced with regulations that say future costs can be used if "incurred," but that nowhere say that these costs must be firmly fixed, the FEA resorts to several arguments to remedy this lack of explicit textual support.

Section 4(b)(2)(A), 15 U.S.C. § 753(b)(2)(A), of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 751 *et seq.*, states that the regulations "shall provide for a dollar-for-dollar passthrough of net increases in the cost of crude oil . . . ." From this the FEA contends that passing through to consumers increased prices on anything but a dollar-for-dollar basis violates the statute, and estimated costs, because they are approximations determined on an accounting basis, cannot be exactly dollar-for-dollar. It is doubtful the statute means more than that $1.25 is not to be passed through for $1.00 of increased cost. That is, refiners cannot pass on increased costs in a way that keeps profit margins at earlier levels. *See generally* [1975] U.S. Code Cong. & Admin. News 1762, 1919. Also, the regulations promulgated by the FEA define "landed-cost" between related companies in terms of "accounting procedures generally accepted and consistently and historically applied by the firm concerned." 10 C.F.R. § 212.83(b)(2)(4). These costs are to be used in computing the prices charged consumers. If the use of accounting procedures to estimate costs for related

companies is prescribed by regulation, despite the dollar-for-dollar passthrough language of the statute, the FEA cannot argue that the statute absolutely bars estimates in calculating "increased product costs." The FEA's own regulations preclude the FEA's statutory construction.

Another argument of the FEA rests on its perception of Congress' intent in enacting the EPAA. Congress, in passing that statute, specified that a goal was the distribution of crude oil, residual fuel oil, and refined petroleum products at "equitable prices." Section 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F). A related objective cited by the FEA is to keep down prices paid by consumers. However, while the FEA rightly observes that equitable prices and the lowering of consumer costs were concerns of Congress, it wrongly ignores the other objectives. Congress has directed that regulations be drafted that "to the maximum extent practicable" achieve nine separate goals. To a certain degree these objectives conflict, and the FEA must be given discretion in deciding how to accommodate these inconsistent goals. *General Crude Oil Co. v. Department of Energy*, 585 F.2d 508, 516 (Em. App.1978); *Amtel, Inc. v. Federal Energy Administration*, 536 F.2d 1378, 1383 (Em. App.1976). It is also true "'that, in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another.'" *Id.* at 1383 n.9 quoting (Joint Explanatory Statement of the Committee of Conference on the Allocation Act). Even so, the Committee, while observing that flexibility is needed, did not authorize the raising of one objective above any other or the satisfying of a single objective at the cost of several others. Indeed, this court has already held that no one goal in general—or the goal of equitable pricing in particular—is to be "elevate[d] . . . to the level of a mandatory duty . . . ." *Consumers Union of the United States, Inc. v. Sawhill*, 525 F.2d

transaction." The crude oil was purchased in September 1973, but no increase in product costs was calculated that month. The fact remains, however, that the cost had already been incurred even if the amount was uncertain.

Once Sohio entered into the binding obligation to buy foreign oil, the cost had been "incurred" under the regulations, even though no increase in product costs took place until later and the quantum of the increase later changed.

1068, 1072 (Em. App.1975) (en banc). The same opinion noted that equitable pricing "is but one of nine equally important goals." *Id.* (emphasis in original).

Besides equitable pricing, the statute calls for the "preservation of an economically sound and competitive petroleum industry," "economic efficiency," and "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." 15 U.S.C. § 753(b)(1)(D), (H), (I). The FEA's interpretation of the regulations does not foster economic efficiency or minimize economic distortion. The key to the smooth operation of a free market economy is that buyers and sellers through the forces of demand and supply find the equilibrium price where demand equals supply. At that point the economy operates most efficiently. *See* Samuelson, Economics 67–68, 630–32 (10th ed. 1976); Dorfman, Prices and Markets 128–36 (1st ed. 1967). It is at this price that resources will best be allocated. As Samuelson states:

> The final competitive equilibrium is an "efficient" one. Because prices equal marginal costs, output is being maximized, inputs are being minimized; . . . . From so efficient a final point, you can no longer make everyone better off. You can help (A) only by hurting (B).

*Id.* at 632.

Under the FEA's interpretation of the regulations, for several months the price charged for some refined products should have been set by assuming that it was refined only from "old" crude oil (which it was not) or that the price of foreign crude oil had not risen (which it had). Thus, the real cost of producing the refined product would be higher than the price the FEA would allow Sohio to charge. The price of the products would be set, not by the free market, but by an insistence that costs be

fixed before they be used in establishing a price. Inaccurate economic information would be conveyed; truthful information suppressed. Yet the key to the price system "is its power to elicit and transmit essential economic information and to stimulate appropriate decisions by producers and consumers." Dorfman, *supra*, at 136.

Thus, the FEA's interpretation of its regulations, by causing a deviation from free market price, neither enhances economic efficiency nor minimizes economic distortion.[4] It is also doubtful that preventing Sohio from recouping its actual expenses helps preserve a sound petroleum industry. Moreover, one can question whether the FEA's position promotes equitable pricing vis-a-vis consumers. Adopting the FEA's interpretation could mean that the prices paid for refined products by Sohio's customers would differ even though the cost to Sohio of making the product was the same. For example, compare the prices paid by two consumers who purchase at different times a refined product made from the same crude oil: One buys after the percentage of "new" oil is known, and the other buys when the proportion is still uncertain. Under the FEA's view, the former consumer pays more, although the cost to Sohio of the product is identical in either case. This can scarcely be considered equitable. That such a result is possible also illustrates the kinds of economic distortions that the FEA's system renders possible. Therefore, after weighing the relevant objectives listed by Congress, this court finds that the FEA's reliance on 15 U.S.C. § 753(b)(1) is misplaced.

The FEA also relies upon *Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), where the Supreme Court states that accounting principles must yield where

---

**4.** It is true that other regulations that interfere with the free market economy have been upheld and that Congress was concerned about "holding down spiraling consumer costs." Appellee's Brief at 11. These facts, however, do not relieve this court of its statutory obligation to examine all of the objectives. The FEA's interpretation of regulations cannot be sus-

tained merely on the basis that such an interpretation "was expressly designed to prevent price gouging" and to hold down costs. That analysis deprecates the congressional command to examine all nine factors, and ignores this court's holding that no one factor can be elevated above all others.

incompatible with the tax laws. *Thor* has nothing to do with this case. In *Thor*, despite detailed regulations governing the valuation of inventories, the taxpayer used its own method. *Thor* is a case where explicit regulations were disobeyed; here the controlling regulation is ambiguous and the sole issue is its meaning. Unlike the taxpayer in *Thor*, who ignored the regulations to follow its accounting principles, Sohio, because it reasonably defined the meaning of "incurred," could properly use accounting techniques.

The FEA points to practical considerations to support its interpretation. It contends that audits could not be conducted on a current basis, that two audits would be needed—one at the time of the estimate and then a later one when the costs were finally ascertained—and that procedures would have to be developed to refund overcharges. No evidence was submitted, however, showing that any of these factors is actually substantial.

The FEA also asserts that its interpretation should be accepted because Sohio's construction is easily susceptible to abuse. The FEA takes this position despite its failure to dispute the accuracy of Sohio's estimates. In the case of the "time-trade transaction," Sohio chose, not an arbitrary figure, but the listed world price. Additionally, Sohio stated at oral argument that if its estimate had been high it would have refunded the money to identifiable customers, or refunded the excess to the general public if the consumers could not be identified. As for the "new" oil premiums, the FEA does not contest Sohio's claim that its estimates were low, not high. Nor does the FEA disagree with Sohio's representation that refunds would be made. The FEA's argument concerning pragmatic considerations is under-

cut by its own inflexibility: It would have it that no matter how good the estimates and irrespective of what procedures exist to return erroneous charges, estimates can never be employed.

Finally, the FEA relies on the principle of deference to administrative interpretation of an agency's own regulations. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock and Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *United States v. Lieb,* 462 F.2d 1161, 1166 (Em.App.1972). The validity of this principle is not disputed.

■ This rule, though, is not absolute. Administrative interpretations do not control if they are plainly erroneous or if they are inconsistent with the regulation. *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Shell Oil Co. v. Federal Power Commission,* 491 F.2d 82, 88 (5th Cir. 1974). After reviewing the FEA's interpretation, this court has found that the interpretation, even with the deference accorded to the FEA's analysis, simply cannot be regarded as a defensible reading of the regulation in question.[5]

The judgment of the district court is affirmed.

GRANT, Judge, dissenting.

I respectfully dissent. In my view, the decisive issue in this case is more properly stated as follows:

Whether the district court erred in finding that the FEA's Appeal Decision and Order, which determined that under Section 212.83 only costs of crude oil which are fixed and certain in a month of measurement may be included in the calculation of increased product costs available for recovery in a current month, is

---

5. It should also be noted that the FEA's interpretation of the word "incurred," aside from being inconsistent with the regulations, is also at odds with the ordinary meaning of the word. Webster's New Collegiate Dictionary defines "incur" as "to become liable or subject to." Sohio, under this definition, incurred a cost upon signing the contracts, for it then became liable to pay for the crude oil, regardless of price. The obligation arose with the signing of

the contracts, not with the delivery of the foreign crude oil and not with the ascertaining of the proportion of new oil in the domestic transaction. The district court said that a cost is "incurred" "when a reciprocal obligation to pay for the item received arises." The district court's interpretation is consistent with the plain meaning of the word; the FEA's definition engrafts without foundation the additional requirement of cost being known.

inconsistent with this regulation and thus exceeded the scope of FEA's authority.

The applicable regulation here (Section 4(b)(2)(A) of the Emergency Petroleum Allocation Act) provides that in determining prices, the regulations

(a) shall provide for a dollar-for-dollar passthrough of net increases in the cost of crude oil . . . and refined petroleum products . . . through the retail level.

The ceiling prices of petroleum products to each class of purchasers were frozen at May 15, 1973 levels with an adjustment to permit the passthrough of increased product costs incurred in the month of measurement. A refiner is not permitted to pass through to its customers any more than that May 15, 1973 base price, plus a dollar-for-dollar passthrough of subsequent *net increases in its product costs incurred between the month of measurement and the month of May, 1973,* plus certain non-product costs "and *measured pursuant to the provisions of* Section 212.83 . . . etc." The definition of the term "landed cost," as set forth in Section 212.83(b) of the FEA Mandatory Price Regulations, prior to its amendment on October 31, 1974, read as follows:

"Landed Cost" means:

(1) For purposes of *complete arms-length transactions, the purchase price at the point of origin plus the actual transportation cost.*

(2) For purposes of *products purchased in arms-length transactions and shipped pursuant to a transaction between affiliated entities,* the purchase price at the point of origin plus the transportation cost computed by use of the accounting procedures generally accepted and consistently and historically applied by the firm concerned.

(3) For purposes of *products purchased in a transaction between affiliated entities* and shipped pursuant to an arms-length transaction, the cost of the product computed by use of the customary accounting procedures generally accepted and consistently and his-

torically applied by the firm concerned plus the actual transportation cost.

(4) For purposes of *products purchased and shipped pursuant to a transaction between affiliated entities,* the costs of the product and the transportation both computed by use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned. (10 C.F.R. § 212.83(b)). (Emphasis supplied.)

Sohio points to the repeated reference to and acceptance of "the use of the customary accounting procedures generally accepted and consistently and historically applied by the firm concerned" in the above-quoted Section 212.83(b). However, as the district court properly pointed out and need be repeated here, only Paragraphs 2, 3, and 4 are so modified and they are not involved in this proceeding. In Paragraphs 2, 3, and 4, FEA had thereby identified those few specific instances in which historical or customary accounting procedures could be used. It is my view that if it were intended that any particular form of accounting would fill the demands of Paragraph 1, the FEA would have said so. The fact that such language is *not* used in Paragraph 1, alone among the four paragraphs of the Section, can but emphasize the fact that accounting procedures could not be applied that would interfere with the plain language of the paragraph, namely, that "landed cost, for purposes of complete arms-length transactions [means] the purchase price at the point of origin, plus the actual transportation cost." No language could be clearer. It can only mean ascertainable costs, actually and in fact incurred *in the month of measurement.* We must recognize that there is a difference in incurring an obligation and incurring a cost.

If a refiner is to be permitted to enter into a "time-trade" transaction promising to re-deliver crude oil five or six months in the uncertain future, and then estimate his current costs on the basis of what he thinks his re-delivery costs of crude oil are going to be

five or six months in the future, are we also going to permit him to gamble on what the market will be a year hence, or more? Nobody required Sohio to enter into this transaction. It was done by the company to meet present customer demands and to remain competitive in the open market. It was a routine business decision, probably not uncommon between the large oil refiners. It is true that there did exist an obligation to pay something at a specified future date but that amount was unknown and, of course, would be subject to the vagaries of a fluctuating and uncertain world market. I have no quarrel with the procedure, but I am unable to agree with a "costing" program that requires today's consumers to pay for those unknown and uncertain higher oil prices that may be inflicted on the world economy five or six months hence.

Applying this to the facts of the case at bar, I can see no justice in a system that would require the American gas-consuming public to pay those estimated higher prices in September and October, 1973, that the refiner will not be required to pay out until the spring of 1974. The price of oil on the world market in the spring of 1974 was more than double the price prevailing in the fall of 1973 when this "time-trade" arrangement was entered into. Why should the refiner be permitted to exact from the consumer, months and months in advance, those higher prices that OPEC and inflation might later inflict upon us? In approving such a program, are we not, in effect, exacting additional monies from the consumer to serve as an interest-free loan or advance to the refiner, not to be paid out by him until actual prices are known and he will make re-delivery of the oil he has contracted to re-deliver? Accounting procedures and mathematical formulae aside, I cannot escape the conclusion that, by approving this program, Sohio is passing through to its customers more in increased product costs than it was actually paying out at that time, and requiring the customer to help

underwrite Sohio's operations in a rising and uncertain market.

Nor am I able to agree with the majority on the inapplicability of the rationale of *Thor Power Tool Co. v. Commissioner of Internal Revenue Service*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), to the issue here under consideration. True, *Thor* is a tax case, arising out of a taxpayer's write-down of inventory "in accord with generally accepted accounting principles," but which IRS decreed should be disallowed on the ground that the write-down did not serve to reflect income clearly for tax purposes.

In pointing out the differing objectives of tax and financial accounting,* the Supreme Court, in *Thor*, said:

Third, the presumption petitioner postulates is insupportable in light of the vastly different objectives that financial and tax accounting have. *The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled.* The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc.

. . .

This difference in objectives is mirrored in numerous differences of treatment. Where the tax law requires that a deduction be deferred until "all the events" have occurred that will make it fixed and certain, *United States v. Anderson*, 269 U.S. 422, 441 [46 S.Ct. 131, 134, 70 L.Ed. 347] (1926), accounting principles typically require that a liability be accrued as soon as it can reasonably be estimated. Conversely, where the tax law requires that income be recognized currently under "claim of right," "ability to pay," and "control" rationales, accounting principles may defer accrual

---

* We are here presented with a consideration of the differing objectives of the EPAA and financial accounting.

until a later year so that revenues and expenses may be better matched. *Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to · preserve the revenue, can give no quarter to uncertainty. This is as it should be. Reasonable estimates may be useful, even essential, in giving shareholders and creditors an accurate picture of a firm's overall financial health; but the accountant's conservatism cannot bind the Commissioner in his efforts to collect taxes.* . . .

Finally, a presumptive equivalency between tax and financial accounting would create insurmountable difficulties of tax administration. Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management. Such, indeed, is precisely the case here. *Variances of this sort may be tolerable in financial reporting, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax.* If management's election among "acceptable" options were dispositive for tax purposes, a firm, indeed, could decide unilaterally—within limits dictated only by its accountants—the tax it wished to pay. Such unilateral decisions would not just make the Code inequitable; they would make it unenforceable. (439 U.S. at 542–44; 99 S.Ct. at 786–87, 58 L.Ed.2d at 801–803 (Emphasis added.)

These words from *Thor* are equally applicable to the decisive question presented in this appeal.

Furthermore, in evaluating the agency's own interpretations of the regulations, it is helpful to examine the Congressional intent in enacting the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 *et seq.* Congress provided therein that regulations promulgated thereunder shall "to the maxi-

mum extent practicable" provide *inter alia* for the "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices . . . ." Section 4(b)(1)(F).

The Conference Report accompanying the EPAA unequivocally explained that the reference to "equitable prices" in the list of the nine EPAA objectives, set forth in Section 4(b)(1), is:

specifically intended to emphasize that *one of the objectives of the mandatory allocation program is to prevent price gouging* or price discrimination which might otherwise occur on the basis of current shortages. On the other hand, it is contemplated that the prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation. . . . Most importantly, the President must, in exercising this authority, strike an equitable balance between the sometimes conflicting need of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs. 2 *CCH Energy Management,* ¶ 10,610, p. 10619–11. (Emphasis added.)

The price regulations here at issue provided that the selling price of petroleum products to each class of purchasers was frozen at May 15, 1973 levels, "with an adequate adjustment to permit the pass-through of increased product costs incurred between the month of measurement and the month of May, 1973." This, to me, represents an attempt to comply with the expressed Congressional intent to "hold down spiraling consumer costs." Certainly nothing could be more inflationary than charging tomorrow's prices today.

Guided by that clear expression of Congressional intent, I would hold that the FEA Appeal Decision and Order, which determined that under 10 C.F.R. § 212.83 only costs of crude petroleum which are fixed and certain in the month of measurement may be included in the calculation of increased product costs available for recovery

in a current month, is consistent with the regulations and did not exceed the scope of FEA's authority.