GETTY OIL COMPANY, a corporation, Plaintiff,

v.

The DEPARTMENT OF ENERGY OF THE UNITED STATES, James R. Schlesinger, Secretary of Energy, the Economic Regulatory Administration, David J. Bardin, Administrator of the Economic Regulatory Administration, and John F. O'Leary, Deputy Secretary of Energy, Defendants.

The UNITED STATES of America, Plaintiff,

v.

GETTY OIL COMPANY, Defendant.

Nos. CV 77–4533–WMB, CV 78–1620–WMB.

United States District Court, C. D. California.

Dec. 29, 1978.

Moses Lasky, Richard Haas, Charles Cohler, Lasky, Haas, Cohler & Munter, San Francisco, Cal., Robert E. Hafey, Los Angeles, Cal., C. Lansing Hays, Jr., Hays & Lanssman, New York City, for Getty Oil Co.

Andrea Sheridan Ordin, U. S. Atty., Donna F. Goldstein, Asst. U. S. Atty., Los Angeles, Cal., Barbara Allen Babcock, Dennis G. Linder, Attys., Dept. of Justice, Washington, D. C., Neal J. Tonken, George Kielman, Arthur E. Gowran, Attys., Dept. of Energy, Washington, D. C., for the Government.

## ORDER

WILLIAM MATTHEW BYRNE, Jr., District Judge.

### I. Introduction

Plaintiff Getty Oil Company (hereinafter "Getty") filed this action for injunctive relief, declaratory judgment, and judicial review of a decision and order of the defendant Department of Energy ("DOE") and its predecessor agencies. The DOE ordered Getty to include catalytic coke, a by-product of Getty's oil refining process, in its cost allocation computations. Getty's action was consolidated with an action filed by the United States on behalf of the DOE, seeking, *inter alia*, a declaration that the DOE's actions were valid.[1] At issue is the interpretation of the DOE regulation dealing with refinery cost pass-through computations. Both Getty and the DOE move for summary judgment on the question of the correctness of the DOE's interpretation of its regulation.[2] Both parties agree that there remains no genuine issues of material fact. The parties also agree that Getty has exhausted its administrative remedies, so the case is properly before this Court.

### II. The Factual Background

#### A. The Parties

The Department of Energy is an agency of the United States. It is the successor to the Federal Energy Administration ("FEA") and the Federal Energy Office ("FEO"), whose functions were transferred to the DOE by the Department of Energy Organization Act, 42 U.S.C.A. § 7131 *et seq.* (West Supp.1978).

Getty Oil Co. is a Delaware corporation having its principal place of business in Los Angeles, California. Its predecessor during part of this action, Skelly Oil Company, merged into Getty on January 31, 1977; the two companies will be treated as one. Getty owns and operates a crude oil refinery at El Dorado, Kansas, where it produces refined petroleum products. Getty's refinery process is known as "fluid catalytic cracking," in the course of which a catalyst is utilized. One by-product of the process is catalytic coke, a hydrogen-deficient carbon complex that condenses on the catalyst and deactivates it, thereby interfering with the refining process. To avoid having to supply new catalyst with each processing cycle, the process is designed so that the catalytic coke is chemically altered into other substances with a release of energy in the form of heat which enters into the process. The catalyst is thereby renewed. It is physically impossible to recover the catalytic coke from the process in a concentrated form, nor is the coke commercially recoverable.

#### B. The Regulation in Issue

Like its predecessors, the DOE administers various mandatory pricing regulations governing petroleum products. At issue is the interpretation of one of these regulations, which allows a refiner to pass through its increased costs of producing products. Initially, all saleable products

1. The United States action also contains a count seeking a declaration that Getty's exclusion of another product, refinery still gas, from its cost allocation computations was improper. The motions at hand do not deal with this count, so the two actions will be treated as only one case involving catalytic coke.

2. In the alternative, Getty moves for judgment on the pleadings. Since it treats the motion solely as one for summary judgment in its supporting memoranda, the motion will be so considered.

were subject to price control. However, on May 1, 1974, the FEO amended its regulations (10 C.F.R. § 212.83) to require crude oil refiners to allocate their increased costs between products still subject to price control, called "covered" products, and products no longer subject to price regulation, called "exempt" products. Only the portion of costs allocable to the covered products may be passed through to the price of those products; since exempt products may be sold at whatever price the refiner pleases, the share allocable to exempt products may not be passed along to increase the price of non-exempt (covered) products.

This allocation is calculated by the use of two similar factors, the "V" factor and the "R" factor (effective January 1, 1977). The "V" factor is the ratio of the volume of covered products produced and sold by the refiner to the volume of total (covered plus exempt) products produced and sold by the refiner. The "R" factor substitutes "volume of products refined" for "products produced and sold" as used in the "V" factor. The amount of costs allocable to covered products is determined by multiplying the total costs times the "V" or "R" factors. Thus, the larger the quantity of exempt products there are, the smaller the "V" or "R" factors will be, and the amount of costs that may be passed through will be smaller.[3]

C. *The Controversy*

The controversy between the parties arose when the FEA in its "Notice of Probable Violation" of October 28, 1975 claimed that catalytic coke is a "product" within the meaning of the regulation, and must be included (as an exempt product) in the "V" and "R" factors. The effect of exclusion of catalytic coke in the factors is to increase the amount of costs allocable to covered products, thereby increasing the amount of pass-through. By excluding the catalytic coke, the FEA claimed that Skelly had charged prices for its covered products in

excess of the lawful maximum. After Skelly replied to the Notice of Probable Violation, the FEA issued a "Remedial Order," finding that Skelly had violated the regulation, and ordered Skelly to submit a proposal to refund the alleged overcharges. Skelly filed an administrative appeal of the Remedial Order, which was denied by the FEA in its Appeal Decision on February 25, 1977. Since that decision is a final agency order, Getty had exhausted its administrative remedies, and filed this action for judicial review of the agency determination.

III. *The Level of Judicial Review*

A. *Introduction*

The regulation governing the amount of the cost pass-through and the "V" and "R" factors is 10 C.F.R. § 212.83 (1978). For the purposes of the regulation, "product" is defined by 10 C.F.R. § 212.31 (1978) as a "unit of personal property offered for sale to another person." It is conceded that catalytic coke is physically incapable of being sold. However, the FEA ruled in the Appeal Decision that catalytic coke is a "product" for the purposes of the regulation, reasoning that a "product" is anything from which the refiner derives substantial economic value. The FEA decided that since Getty derives economic value in the form of heat from the catalytic coke when it is burned off the catalyst, the coke is a "product" and must be included in the "V" and "R" factors. The question thus becomes whether the FEA's interpretation of "product" may be sustained in light of the applicable standard of judicial review.

B. *The General Rule—Deference to the Administrative Interpretation*

■ Generally, since the agency empowered to enforce a statute has much greater expertise in the relevant area of law than does the court, the court should defer to the agency's interpretation of the statute and

3. *E. g.,* if $V_i$ is the volume of covered products produced and sold, and V is the volume of total products produced and sold, the "V" factor will be $V_i/V$. As the denominator V increases, the fraction will decrease. When the total costs are multiplied by a smaller fraction, the costs allocable to covered products will also decrease.

its own regulation. In *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), when faced with the interpretation of an executive order implementing the Mineral Leasing Act, the Court held that the Interior Secretary's interpretation need not be the only reasonable one, and that the courts should exercise great deference to the interpretation of a statute by the officers or agency charged with its administration. Moreover, the Court held that "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Id.* at 16, 85 S.Ct. at 801. Thus, deference applies when the meaning of the words of the regulation is in doubt, and the agency interpretation is not clearly erroneous or inconsistent with the regulation. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

 As an alternative standard of review, the DOE suggests the standard provided in Section 211(d)(1) of the Council on Wage and Price Stability Act, 12 USC § 1904 (1976), that a District Court shall not set aside an order of the agency unless such order is found to be in excess of the agency's authority or based upon findings not supported by substantial evidence. Here, the order of the FEA was within that agency's authority,[4] and there are no issues of fact which require a determination of whether the order was supported by substantial evidence. The only issue is a question of law, i. e. the interpretation of a regulation. Accordingly, the "substantial evidence" standard of review is inapplicable, and the deference standard will be applied. *See Volkswagenwerk A. G. v. Federal Maritime Commission*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

### C. *No Deference When There is a Plain and Unambiguous Meaning*

 An exception to the deference rule is that no deference need be given to an agency's interpretation of a regulation that is clearly contrary to the "plain and sensible meaning" of that regulation. In *Hart v. McLucas*, 535 F.2d 516, 520 (9th Cir. 1976), a regulation proscribed "intentionally false" statements. The agency ruled that the regulation was violated by the intentional making of a statement which was false but not known to be so. The Ninth Circuit held that since the plain meaning of the regulation was clearly contrary to the construction urged by the agency, no deference need be accorded by the court to the agency's interpretation. In *Marathon Oil Co. v. Kleppe*, 556 F.2d 982, 986 (10th Cir. 1977), the court stated "[w]hen an agency interpretation is at odds with the clear and understandable language of a regulation, the latter must control and be given effect." *See also Francis v. Davidson*, 340 F.Supp. 351 (D.Md.), *aff'd mem.* 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972). Also, words of familiar usage are to be used in their ordinary sense. *NLRB v. Coca-Cola Bottling Co. of Louisville*, 350 U.S. 264, 268–69, 76 S.Ct. 383, 100 L.Ed. 285 (1956).[5]

---

**4.** Getty argues at length that the FEA, the DOE's predecessor, had no power to issue remedial orders before October 1, 1977. This argument is without merit. It is true, as Getty claims, that § 503 of the Department of Energy Organization Act, 42 U.S.C. § 7193, effective October 1, 1977, first authorized the DOE to issue remedial orders. However, the FEA already had this power. 15 U.S.C. § 761 *et seq.* (1976) (since repealed by the DOE Organization Act, *supra*), created the FEA. 15 U.S.C. § 765 (1976) transferred to the FEA Administrator all functions of the Cost of Living Council. This was effective June 27, 1974, well before the Remedial Order in this case issued in September, 1976. Finally, the Cost of Living Council had the power to issue regulations *and*

orders under Executive Orders nos. 11615, 36 Fed.Reg. 15727 (1971), 11627, 36 Fed.Reg. 20139 (1971), § 4(a)(iii). Therefore, the FEA had the authority to issue the Remedial Order in question.

**5.** That case went on to note that if the words of the statute have a peculiar connotation in the context used, that the technical or special meaning should be used. In this case, however, the DOE has advanced no arguments that the words "product" and "sale" have a technical meaning in the petroleum industry. DOE's argument (discussed below) that the terms "sale" and "product" must be construed broadly to comply with the Congressional intent still does not impart a *technical* meaning to those terms.

IV. *The Definition of "Product" and "Sale"*

■ As stated above, the regulation defines "product" as "a unit of personal property offered for sale to another person." The term "sale" is not defined by the regulation. However, for the purposes of the regulation, 10 C.F.R. § 212.31 (1978), the FEA has previously defined "sale" as its "common meaning of transfer of title to goods for consideration." *See Gulf Oil Corp.,* 3 FEA ¶ 80,636 at 81,023 (1976).[6] This definition is essentially identical to definitions of "sale" used in other contexts. *See, e. g., Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (a federal income tax case defining sale as a transfer of property for a fixed price); Cal. Rev. & Tax Code § 6006 (West Supp.1978) (for state sales tax purposes, defining sale as transfer of title or possession of personal property for consideration); UCC § 2–106(1) ("The passing of title from the seller to the buyer for a price."). Therefore, for a "sale" to occur, there must be some transfer of title or possession. It is undisputed that since it is physically impossible to separate the catalytic coke from the catalyst, neither title nor possession of the coke can ever be transferred, and the coke cannot be, and never has been, "sold" to another entity. The FEA has ruled that a "product" is defined as something from which a refiner derives substantial economic value. This definition is clearly contrary to the plain and sensible meaning of the regulation, so this Court will not defer to the agency's interpretation. Hence, catalytic coke is not a "product" under 10 C.F.R. § 212.31 (1978).

■ The DOE also urges that in order to effectuate the Congressional intent to maintain reasonable consumer costs and to provide for pass-through of only those costs properly allocable to covered products, the regulation's definition must be construed broadly to include all "products" from which the refiner derives economic value. The Congressional intent in this regard is irrelevant. Under the statute, the DOE *could have* adopted a regulation using "economic value" as a definition of "product"; but since it chose not to do so, the regulation actually adopted must be applied as written. *See Tobin v. Edward S. Wagner Co.,* 187 F.2d 977, 979 (2d Cir. 1951) (holding that a regulation should not be deemed to include what the administrator might have covered but did not.)[7]

■ DOE also relies on its prior interpretive ruling of the regulation, Ruling 1974–27, 39 Fed.Reg. 44415 (1974). It should first be noted that the legal effect of an interpretive ruling of an agency is merely that of an opinion of the legal staff of the agency and will be rejected if it is deemed to be in conflict with the clear and unambiguous meaning of the regulation. *American President Lines, Ltd. v. Federal Maritime Commission,* 114 U.S.App.D.C. 418, 421, 316 F.2d 419, 422 (D.C.Cir.1963); *Joseph v. United States Civil Service Commission,* 180 U.S.App.D.C. 281, 295, 554 F.2d 1140, 1154 n.26 (D.C.Cir.1977). Ruling 1974–27 stated that a refiner's use of its refined fuel in its own delivery trucks was an intra-entity "transfer for value" that conferred economic value on the refiner. The Ruling held that although items so transferred are not sold to other persons,

---

**6.** *Gulf Oil* involved a dispute over the definition of "transaction," which was defined as an "arm's-length sale between unrelated persons" in 10 C.F.R. § 212.31 (1978), the same as the regulation in dispute here (which also defines "product"). The DOE attempts to distinguish *Gulf Oil* on the ground that the definition of "transaction" involves only "arm's-length" sales, which the definition of "product" does not. This argument is without merit; the definition of "product" still requires some "sale," even if it is not arm's-length. Since the definition of a term in one part of a statute may be assumed to be the same as that used in another

part of the statute, the definition of "sale" used in *Gulf Oil* also applies here. *See Pampanga Sugar Mills v. Trinidad,* 279 U.S. 211, 218, 49 S.Ct. 308, 73 L.Ed. 665 (1929).

**7.** The case went on to say that regulations should not be construed literally, and that much weight should be given to administrative interpretations. This is but another statement of the general deference rule which, as stated above, does not apply when the agency's interpretation is contrary to the plain meaning of the regulation.

the refiner derives "clear economic value" from its use of its own refined fuel and is required to include the volumes of such fuel used internally in the "V" and "R" factors. The refined fuel in question, unlike catalytic coke, was physically capable of being sold or offered for sale to others and may arguably fall within the regulation's definition of "product." Even if the ruling is correct with regard to refined fuel, however, it has no application to substances such as catalytic coke which are not "products" within the meaning of the regulation because they physically cannot be sold, offered for sale, or purchased from other entities.

### V. *Conclusion*

Accordingly, this Court holds that the DOE's interpretation of its regulations is contrary to the plain and unambiguous meaning of the regulations, and that catalytic coke is not a "product" within the meaning of 10 C.F.R. § 212.31 (1978), for the purpose of the cost allocation factors of 10 C.F.R. § 212.83 (1978).

The foregoing shall constitute findings of fact and conclusions of law.

Therefore, IT IS ORDERED that:

(1) The motion of Getty Oil Company for summary judgment in Civil Action 77–4533–WMB and for summary judgment on all issues in Civil Action 78–1620–WMB concerning catalytic coke is hereby granted.

(2) The motion of the United States for summary judgment in Civil Action 78–1620–WMB and in Civil Action 77–4533–WMB is hereby denied;

(3) The Remedial Order of the Federal Energy Administration of September 1, 1976, in Case 680R00096, and the Decision and Order of the Federal Energy Administration of February 25, 1977, in Case FEA–0953, are null, void, and without effect.

(4) At no time did any volume of catalytic coke need to be included in Getty's computation of its costs allocable to covered products; that is, that in the determination of the ratio known as the "V factor" no volume of catalytic coke needed to be included as part of the volume of all products sold; that the same is true of the determination of the "R factor"; and that Skelly Oil Company therefore acted correctly, and that Getty Oil Company continues to act correctly, in not including catalytic coke in computing either the "V factor" or the "R factor."

(5) That the defendants in Civil Action 77–4533–WMB, the plaintiff in Civil Action 78–1620–WMB, and the officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with such parties, are hereby enjoined and restrained from enforcing or attempting to enforce against Getty Oil Company the Remedial Order of September 1, 1976, or the Decision and Order of February 25, 1977.