KOCH REFINING COMPANY, a Delaware Corporation, Plaintiff,

and

Ashland Oil, Inc., a Kentucky Corporation, Plaintiff-Intervenor,

v.

UNITED STATES DEPARTMENT OF ENERGY, Charles W. Duncan, Jr., Secretary, United States Department of Energy, Robert G. Bidwell, Jr., Chief of Crude Oil Allocations, Economic Regulatory Administration, United States Department of Energy, and Melvin Goldstein, Esq., Director, United States Department of Energy, Office of Hearings and Appeals, Defendants,

and

Mobil Oil Corporation, Defendant-Intervenor.

STATE OF MINNESOTA, by its Attorney General Warren Spannaus and its Energy Agency, Plaintiff,

v.

UNITED STATES DEPARTMENT OF ENERGY, Charles W. Duncan, Jr., Secretary, United States Department of Energy, Robert G. Bidwell, Jr., Chief of Crude Oil Allocations, Economic Regulatory Administration, United States Department of Energy, and Melvin Goldstein, Esq., Director, United States Department of Energy, Office of Hearings and Appeals, Defendants,

and

Mobil Oil Corporation, Defendant-Intervenor.

Nos. CIVIL 4–80–292, CIVIL 4–80–315.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 18, 1980.

Joe A. Walters, William E. Flynn, and Douglas J. Franzen, O'Connor & Hannan, Minneapolis, Minn., for plaintiff Koch Refining Company.

Gordon G. Busdicker, James B. Loken, and John F. Beukema, Faegre & Benson, Minneapolis, Minn., for plaintiff-intervenor Ashland Oil, Inc.

James Hamilton, Ginsburg, Feldman, Weil & Bress, Washington, D. C., for plaintiff Koch Refining Company and plaintiff-intervenor Ashland Oil, Inc.

Warren R. Spannaus, Atty. Gen., State of Minnesota, and Dwight S. Wagenius and William P. Donohue, Special Asst. Attys. Gen., St. Paul, Minn., for plaintiff State of Minnesota.

Thomas K. Berg, U. S. Atty., and Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., and Sandra K. Webb and Samuel Soopper, U. S. Dept. of Energy, Washington, D. C., for defendants U. S. Department of Energy, Charles W. Duncan, Jr., Robert G. Bidwell, Jr., and Melvin Goldstein.

Thomas C. Kayser and Gary J. Haugen, Robins, Davis & Lyons, Minneapolis, Minn., Michael J. Madigan, Edward L. Rubinoff, and David A. Holzworth, Akin, Gump, Hauer & Feld, Washington, D. C. (William C. Streets, Mobil Oil Corporation, New York City, of counsel), for defendant-intervenor Mobil Oil Corp.

MEMORANDUM INCORPORATING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR A PRELIMINARY INJUNCTION

MacLAUGHLIN, District Judge.

This matter is before the Court on the motions of plaintiff Koch Refining Company (hereinafter "Koch"), Ashland Oil, Inc. (hereinafter "Ashland"), and the State of Minnesota for a preliminary injunction barring the reclassification of Koch and Ashland oil refineries under the Canadian Allocation Program (hereinafter "CAP"). This memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

The Court has jurisdiction over the subject matter pursuant to the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1), which incorporates the judicial review provisions of Section 211 of the Economic Stabilization Act of 1970 (found as a note to 12 U.S.C. § 1904), 28 U.S.C. §§ 1331, 2201, and 2202. This Court's order of June 13, 1980, found that venue is proper in this district under 28 U.S.C. § 1391(e)(2).

*The Parties*

Plaintiff Koch is a Delaware corporation whose headquarters is located in Wichita, Kansas. Koch's primary business activity is the operation of its wholly-owned crude oil refinery located in Pine Bend, Minnesota. Koch has been qualified to do business in the State of Minnesota since 1951.

The Koch refinery has a capacity of approximately 127,000 barrels per day (hereinafter "B/D") and employs approximately 490 employees at Pine Bend. In 1979 it processed approximately 126,000 B/D. The refinery was designed and constructed in 1954–55 for the express purpose of refining crude oil imported from Canada. The Canadian crud received by the Koch refinery originates in the Fosterton area of Saskatchewan province. It is characterized by its heavy weight (a density of 22 degrees, as measured on the American Petroleum Insti-

tute scale)[1] and its high sulfur content (up to 3 percent).[2] The heavy Canadian crude reaches the Pine Bend refinery via the Interprovincial Pipeline, which becomes the Lakehead Pipeline at the U.S.-Canada border, and the Minnesota Pipeline which connects with the Lakehead at Clearbrook in northwestern Minnesota, and extends to the Twin Cities of Minneapolis and St. Paul.

The capacity of the Koch refinery was originally 20,000 B/D. Since 1955, major expansions have been undertaken on the assumption that heavy Canadian crude would be available for refining. To that end, the refinery contains towers, vacuum units, and cokers designed to handle heavy crude, and its distillate units are smaller than those of other refineries. Other types of crude are refined when heavy crude is unavailable, but significant penalties in terms of economic efficiency are sustained. In past years the Koch refinery has used Canadian oil for up to 80 percent of its crude oil runs and today still remains dependent on imports of Canadian crude.

Koch Refining Company is a subsidiary of Koch Industries, which is the parent to over one hundred affiliated entities. However, the Pine Bend refinery is the only refinery owned by any of the Koch family of companies. It is classified both as a "small refiner" and as an "independent refiner" under the Emergency Petroleum Allocation Act of 1973 (hereinafter the "EPAA"), 15 U.S.C. § 752(3) and (4), a categorization that is important to this case.

Ashland, a Kentucky corporation having its principal place of business at Ashland, Kentucky, operates a refinery located at St. Paul Park, Minnesota. It operates seven refineries across the nation, three of which have processed Canadian crude since 1976. Ashland is qualified to do business in the State of Minnesota and has owned and operated its Minnesota refinery since 1970.

The St. Paul Park refinery's capacity is 67,000 B/D. Although it has been equipped to handle 15,000 B/D of heavy crude oil, its design is such that it processes primarily light sweet crude. Ashland receives its Canadian oil via the Interprovincial, Lakehead, and Minnesota Pipelines. The Ashland refinery is classified as "independent" under the EPAA, but is not "small" in light of the fact that it is owned by a company that operates several refineries.

Together, the Koch and Ashland refineries supply over 50 percent of all the refined petroleum products consumed within Minnesota.[3] Also, the two refineries sell a portion of their refined products to areas outside Minnesota.

The State of Minnesota is a plaintiff in these consolidated actions and is represented by Warren Spannaus, its Attorney General, and by the Minnesota Energy Agency (hereinafter "MEA"), a statutory agency responsible for enforcing the state's laws relating to energy, including the preparation of allocation plans in the event of an energy shortage, Minn.Stat. ch. 116H (1978 and Supp.1979). The MEA's top priority is

1. "Light" oil has a specific gravity of 30 degrees or higher, while "heavy" oil is under 25 degrees. Arab Light, a well-known crude, has a specific gravity of about 32. Light crude produces greater quantities of gasoline and light fuel oils, while heavy crude is a feedstock for the production of asphalts and heavy industrial oils.

2. Oil with a low sulfur content (below .5 percent) is known as "sweet," while oil with a higher sulfur content is "sour." Oil with a sulfur content above 2 percent is very sour.

3. Two other refineries are prime suppliers of oil products to the state. Continental Oil Company (Conoco) operates a refinery at Wrenshall, Minnesota, with a rated capacity of 23,500 B/D. Murphy Oil Company's refinery at Superior, Wisconsin, near the Minnesota border, can process up to 40,000 B/D. The Conoco refinery cannot run the type of heavy crude oil presently available from Canada. The Murphy refinery can and does run heavy Canadian crude oil, but its first priority status under the CAP has not been challenged and is not a subject of this proceeding.

Minnesota also receives refined products via two pipelines. The Amoco pipeline is a proprietary line which runs from Mandan, North Dakota to the Twin Cities and from Chicago to the Twin Cities. The Williams Brothers pipeline system is a common carrier which connects Minnesota with mid-continent oil fields and refineries.

to insure that the state has adequate and secure access to petroleum products.[4] The state is the largest single consumer in Minnesota of # 1 and # 2 fuel oils for heating. If it is unable to purchase enough distillate to meet its needs, it must curtail official business and close public buildings. Any statewide shortage of petroleum products also affects its regulatory program. For example, during the winter of 1977, the MEA and the state's Executive Council were forced to declare an energy emergency in light of the low stocks of oil products in the state. During that time, the MEA opened and supervised an emergency operations center. The state is also affected by energy shortages due to reductions in state tax revenues which decline as industrial output decreases and unemployment increases.

The United States Department of Energy (hereinafter "DOE") is an agency and instrumentality of the United States established under the Department of Energy Organization Act of 1974, 42 U.S.C. § 7101 *et seq.* It is given primary responsibility for administration of the EPAA. The DOE is a defendant in this case by virtue of a decision of its Office of Hearings and Appeals (hereinafter "OHA") to change the CAP classifications of Koch and Ashland. Additional federal defendants, all of whom are officers or employees of the United States, and who are sued in their official capacities, are Charles W. Duncan, Jr., Secretary of DOE, Robert G. Bidwell, Jr., Chief of Crude Oil Allocations of the Economic Regulatory Administration (hereinafter "ERA"), and Melvin Goldstein, Esq., Director of the OHA.

Defendant-intervenor Mobil Oil Corporation is a large, multi-national integrated corporation that operates three refineries that have processed Canadian crude oil. They are located at Detroit, Michigan, Ferndale, Washington, and Joliet, Illinois. Were Koch and Ashland to be reclassified,

Mobil's Joliet refinery would be a prime beneficiary of increased quantities of Canadian crude. The Joliet facility receives Canadian oil via the Interprovincial and Lakehead Pipelines.

*Statutory and Regulatory Background*

The EPAA, passed in 1973, directed the President of the United States to promulgate regulations

> providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in . . . and at prices specified in . . . such regulation[s].

15 U.S.C. § 753(a). Pursuant to this mandate, the Federal Energy Administration, the predecessor to the Department of Energy, adopted the Canadian Crude Oil Allocation Program (CAP), 10 C.F.R. § 214, on January 10, 1976. The CAP was and is a program designed to mitigate the negative impacts of the decision of the government of Canada to eliminate all exports of crude oil to the United States within the next few years. Oil is allocated to those refineries which have historically been dependent on Canadian crude and which lack adequate access to alternative supplies.

Briefly, the CAP established two categories of refineries. "First priority" refineries are those that, during a twelve month "base period" from November 1, 1974, to October 31, 1975, depended on Canada for 25 percent or more of their crude oil. "Second priority" refineries are all refineries which processed Canadian crude during the base period but which are not first priority refineries.

The crude oil which is made available to the U.S. by Canada under the CAP is crude which has been designated as surplus within Canada. Once the National Energy Board of Canada determines the amount of heavy crude oil[5] to be exported, U.S. refineries are allocated the crude on the basis of a formula. The ERA has first-line responsi-

---

4. There are no naturally occurring supplies of crude oil in Minnesota.

5. The National Energy Board has also licensed the export of light crude oil, but this case in-

volves only the allocation of heavy crude. In 1979 Canada terminated its exports of light crude.

bility for applying the formula. As the OHA explained the process,

> The procedure for allocating Canadian heavy crude oil involves several steps. In the first two steps, the ERA allocates Canadian heavy crude oil on a pro-rata basis to first priority refineries up to their total base period volumes of Canadian crude oil (less allocations of light crude oil prior to the fourth quarter of 1979). In the third step, heavy crude oil is allocated on a pro-rata basis to second priority refineries up to their base period use of Canadian crude oil. In the fourth step, additional heavy crude oil is allocated on a pro-rata basis to first priority refineries with reference to their nominations for such crude oil. Any remaining heavy crude oil is allocated among second priority refineries according to their total base period volumes of Canadian crude oil less any heavy crude oil allocated in the prior steps (or any light crude oil allocated prior to the fourth quarter of 1979).

Decision and Order of the Department of Energy (hereinafter "Decision and Order"), April 17, 1980, at 3.

When the CAP was enacted, Koch and Ashland were designated as first priority refineries and have remained as such until the present time. Since the promulgation of the CAP, the amount of crude exported to the United States has steadily declined. As a practical matter, allocation is determined solely with reference to the first two steps of the CAP formula, and second priority refineries have received no Canadian crude. For example, for the month of June, 1980, Canada announced that it would export 62,925 B/D. Of that amount, Koch received 58,813 B/D and Ashland received 4,112. No other first priority refineries nominated for Canadian crude; the second priority refiners still received no Canadian oil. Although Canadian exports will increase during the winter months, Canadian heavy crude oil exports probably will be discontinued for the most part in the next year and a half.

The CAP recognizes that an individual refinery's dependence on Canadian crude may vary from time to time, and thus contains provisions for changes in a firm's base period volume and initial designation. 10 C.F.R. § 214.34(a) provides that "the DOE may change its initial priority designation as to a refinery. . . ." This case involves a change in Koch's and Ashland's initial designations. Currently the ERA evaluates the priority status of refiners on a quarterly basis. The allocations to each refiner are adjusted on a monthly basis, in accordance with the National Energy Board's practice of issuing monthly notices as to the amount of Canadian oil to be exported. Because Koch and Ashland consume all of the Canadian heavy crude currently exported, a change in their priority status would lead to allocations of oil to nominating second priority refineries, including the Joliet refinery operated by Mobil.

*Procedural Background*

Subsequent to the designation of Koch and Ashland as first priority refineries, the ERA conducted two public conferences in Minneapolis to reevaluate those priority designations. Each time the ERA concluded that the facts did not warrant redesignation of the two Minnesota refineries.

Both Koch and Ashland were continued as first priority refineries for the quarterly allocation period commencing October 1, 1978. But on October 19, 1978, Mobil filed an administrative appeal with the OHA, contending that the Koch and Ashland designations were unjustified under the CAP regulations. Similar appeals were filed for the second, third, and fourth quarters of 1979. Mobil's basic contention was that Koch and Ashland were capable of replacing at least 75 percent of their base period supplies with non-Canadian crude oil. The OHA consolidated the appeals and convened an evidentiary hearing in January, 1980, to determine disputed issues of fact. The State of Minnesota was allowed to intervene in the proceeding, but the OHA did not allow Koch, Ashland, or the state to present testimony on the economic factors involved in obtaining non-Canadian crude, the hardships to Minnesota and surrounding

states if priority designations were changed, and the access to crude of all refineries in the CAP.[6]

On April 17, 1980, the OHA issued its Decision and Order on Mobil's appeals. Numerous factual and legal issues were discussed therein. Briefly, the Decision and Order concluded that both Koch and Ashland had access to enough non-Canadian oil to require their redesignation, and that the ERA had erred in not redesignating them as second priority refineries. Based on the OHA's Decision and Order, the ERA informed Koch and Ashland that their refineries would be reclassified to second priority under the CAP for all future periods with the exception of the first quarter of each year. Koch Exhibit No. 8.[7]

This action for judicial review of the OHA Decision and Order[8] and for a declaratory judgment and/or injunction prohibiting reclassification was filed by Koch on May 15, 1980. That same day the Honorable Robert G. Renner, United States District Judge for the District of Minnesota, granted Koch's motion for a temporary restraining order precluding the DOE from reclassifying Koch.[9]

Both Mobil and Ashland then filed motions to intervene. Additionally, Ashland filed an application for a temporary restraining order similar to that granted to Koch. A hearing was held on those motions on May 27, 1980. At that hearing the DOE agreed to give Ashland the benefit of the Koch order and to extend the temporary restraining order until a preliminary injunction hearing was held. Mobil was allowed to intervene.

Mobil and the DOE later moved that the case be dismissed on the ground that administrative remedies were not exhausted and also moved that the case be dismissed or transferred due to improper venue. On June 13, 1980, the Court denied those motions and formally allowed Ashland to intervene.

During this same time period a similar case was begun. The State of Minnesota filed suit against the same federal defendants[10] and the Court allowed Mobil to intervene. The DOE and Mobil moved that the case be dismissed on the ground that the State of Minnesota lacked standing, but the motions were denied.

On June 30, 1980, the Court consolidated the two cases, and for four days received evidence and heard oral argument on the motions of Koch, Ashland, and the State of Minnesota for a preliminary injunction barring the reclassification of Koch and Ashland pending a hearing on the merits. The DOE agreed that Koch and Ashland would not be reclassified prior to the Court's decision on the preliminary injunction motions.

The Court has carefully considered the extensive memoranda of the parties, the administrative record, and the evidence and arguments proffered for its consideration during the four-day hearing, and is convinced that a preliminary injunction should issue.

*Standard for Preliminary Injunction*

■ Because this lawsuit involves the CAP, which was adopted under authority of the EPAA, jurisdiction over any appeal from this Court lies exclusively in the Temporary Emergency Court of Appeals (hereinafter "TECA"). *See* 15 U.S.C.

6. There appears to be no dispute that Mobil has adequate access to non-Canadian crude oil.

7. The OHA has been conducting additional proceedings which it has characterized as a "remedy proceeding" to consider the manner in which to implement its decision with respect to the Canadian oil allocation for the quarters under administrative appeal. This further proceeding by the OHA has no effect on the underlying factual and legal determinations which were made in its April 17, 1980 Decision and Order.

8. The Decision and Order stated, at 44, that "[t]his is a final Order of the Department of Energy of which any aggrieved party may seek judicial review."

9. Judge Renner later recused himself and the case was reassigned to this Court.

10. The State of Minnesota suit was transferred to this Court in recognition of the fact that it and the Koch Refining Company action are companion cases.

§ 754(a)(1), incorporating the judicial review provisions of § 211, Economic Stabilization Act of 1970 (found as a note to 12 U.S.C. § 1904).

The TECA has endorsed the so-called "traditional" test for the issuance of preliminary injunctive relief.

The movant must show a substantial likelihood of success on the merits, and that irreparable harm would flow from the denial of an injunction. In addition, the trial judge must consider the inconvenience that an injunction would cause the opposing party, and must weigh the public interest as well.

*McGuire Shaft and Tunnel Corp. v. Local Union No. 1791, U.M.W.*, 475 F.2d 1209, 1216 (TECA), *cert. denied*, 412 U.S. 958, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973), *quoting Quaker Action Group v. Hickel*, 421 F.2d 1111, 1116 (D.C.Cir.1969).

*Irreparable Harm to the Plaintiffs; Public Interest Considerations*

■ In this case, the factor of irreparable harm to Koch, Ashland, and the proprietary interest of the State of Minnesota is inextricably tied to the public interest factor. There is significant doubt that Koch and Ashland will have the time or the physical capability to replace the amount of Canadian oil of which they would be deprived in the event of reclassification. Even if they could, their rational economic response would be to reduce their output by the amount of Canadian oil lost. Either scenario causes irreparable harm to the State of Minnesota and to Minnesota's other petroleum consumers. Indirectly, Koch and Ashland would sustain irreparable harm in that they would not be able to fulfill their responsibilities to those consumers. *Cf. Mobil Oil Corp. v. Department of Energy*, 469 F.Supp. 1119, 1126 (S.D.N.Y.1979) (cutbacks of deliveries to customers constitutes irreparable harm).

There is no doubt but that were Koch to be reclassified, it would lose a substantial amount of Canadian crude. The estimates at the preliminary injunction hearing ranged from a loss of 8,617 B/D to 18,000 B/D.

The 8,617 B/D figure was suggested by Mobil based on calculations of the DOE published in 45 Fed.Reg. 37720 (June 4, 1980). Mobil Exhibit C. It applies to the month of June, 1980. Mobil also estimated that Koch would lose 9,986 B/D for the month of July, 1980. Mobil Exhibit N.

Koch has consistently argued that it would receive approximately 15,000 B/D less in the third quarter and 18,000 B/D less in the fourth quarter if designated a second priority refiner. The Court concludes that the amount of Canadian oil Koch would lose is much nearer to those figures than to the numbers identified by Mobil.

The Koch estimate does presume that a number of second priority refineries which do not currently nominate for Canadian crude oil will do so in the event of reclassification.[11] This assumption appears to be accurate. Were reclassification to occur, significant amounts of crude oil formerly funneled to Koch would become available for second priority refineries. It is therefore likely that second priority refineries which have failed to nominate in the past will do so once their managers realize that nomination will no longer be an exercise in futility.

Further, the Koch estimates presume that some second priority refineries will forego nominations. If all second priority refineries would nominate, the loss would be even more significant. William P. Hougland, President of Koch Oil and also Executive Vice President of Koch Refining, estimated that Canada will export approximately 38,000 B/D during the third quarter and approximately 70,000 B/D during the fourth quarter of 1980.[12] Koch Exhibit 11

---

11. Koch's estimates also assume that Murphy Oil Company, a first priority refiner, would nominate for 10,000 B/D. This assumption is supported by the analysis of Murphy's historical CAP nominations from July 1, 1976, to June 30, 1980. *See* Koch Exhibit 10.

12. The fourth quarter figure is higher because Canadian refineries need more oil in the summer months to satisfy the demand for asphalt.

indicates that Koch would lose between 13,-637 and 14,623 B/D for the third quarter and 20,537 B/D for the fourth quarter. Thus, even though the Court cannot precisely predict what Canada's export levels will be and exactly how many second priority refiners would nominate, reclassification would clearly produce significant decreases in the amount of Canadian oil Koch would receive.[13]

Having determined that Koch would obtain substantially less Canadian crude in the event of reclassification, the question is what impact such a loss would have upon Koch's refining schedule.

There is no doubt that Koch and Ashland could not replace the lost Canadian crude for at least 45 days. During that period of time, Koch and Ashland would have no choice but to refine less crude. This 45-day hiatus is critical in that the supply of distillates to Minnesota consumers during the winter months, the impact of a loss of which is discussed infra, is a function of the amount of distillate which can be inventoried during the third quarter of the year.[14]

The Court also perceives some difficulty in obtaining adequate crude oil supplies at the end of the 45 days after reclassification.[15] The primary potential alternative route for crude oil to replace Canadian crude is the Williams Pipeline, which has in the past been used to pipe some non-Canadian crude oil to Koch and Ashland. However, there was testimony at the preliminary injunction hearing that the Williams Pipeline will not accept for shipment heavy sour oil similar in refining characteristics to Canadian crude, and also refuses to ship lighter crude with a high sulfur content, e.g., West Texas sour crude oil, because such oils purportedly contaminate the refined petroleum products normally shipped through the pipeline.[16] Barging of crude oil from the Gulf Coast on the Mississippi River is another delivery alternative. Koch, assuming the continuance of its access to Canadian oil, projects that it will barge 30,000 B/D to the Pine Bend refinery until the river freezes. This level of 30,000 B/D has seldom, if ever, been attained in the past. It follows that Koch could face difficulties if it were required to barge additional amounts of crude.

In response to difficulties encountered in shipping crude oil on the Williams Pipeline, to the exigencies of barging, and to reduced Canadian exports, Koch has engaged in a sustained effort to obtain a secure source of transportation for non-Canadian oil. The company has explored several proposals to transport crude oil to the Twin Cities from the West Coast. In addition, Koch has attempted to obtain permits to build the Northern Pipeline, which would run from Wood River, Illinois, to Minnesota.[17] Thus far Koch has spent approximately $19.5 million in preparation for that pipeline's con-

13. Fewer barrels of Canadian oil are lost to Koch due to reclassification when Canadian exports are reduced. But the real loss to Koch may be as significant as when export levels are high. It is when export levels drop that each barrel of Canadian oil becomes more important to Koch.

14. Any shortfalls at the end of the third quarter cannot be made up by winter production, but translate directly into reduced wintertime supply.

15. The OHA found that Koch and Ashland could obtain substantial quantities of crude oil via pipeline and barge in the event of reclassification. The Court does not here determine whether that OHA finding was backed by "substantial evidence," Section 211(d)(1) of the Economic Stabilization Act of 1970 (found as a note to 12 U.S.C. § 1904), the standard of review of the merits of an agency's decision.

Rather, the Court notes that it appears from the evidence before the Court at this time that there is a real possibility that Koch and Ashland might face difficulties in obtaining alternate sources of crude oil.

16. Probative of the existence of this pipeline policy is the fact that Koch is vigorously promoting the building of new crude oil pipelines to supply Minnesota refineries, discussed infra.

17. On July 13, 1977, the MEA certified that the Northern Pipeline project was necessary to meet the energy needs of the state. The MEA has also certified the Northern Tier Pipeline project, which would bring Alaskan oil from Washington to Minnesota and Chicago. Construction on that project is not expected to start for some time.

struction. However, the project has been delayed by environmental litigation brought in Illinois, Iowa, and Minnesota courts.

Koch's most recent effort to obtain crude oil for Minnesota is a joint venture with the Williams Pipe Line Company which would link the existing Williams Pipeline serving the Twin Cities area with the existing crude oil pipeline system at Wood River, Illinois. The project would also add pipeline from Bethany, Missouri, to Mason City, Iowa, allowing the present pipeline between Bethany and Mason City to be used solely for the transport of crude oil. This new system is being designed specifically for the shipment of heavy sour crude. The cost to Koch will be approximately $120 million. The project may be fully operational by March or April of 1981.

Therefore, the evidence demonstrates a risk that Koch would not have adequate crude oil supplies in the event of reclassification.

Even if one assumes that Koch has the physical capabilities to replace at least 18,000 B/D of Canadian crude, the question is whether it could economically do so. This question turns on the economics of crude oil refining.

The evidence conclusively proves that Koch would suffer a severe economic penalty if forced to replace that amount of Canadian crude oil. Canadian oil is the most economic feedstock for the Koch refinery. As noted, the refinery was designed to process heavy Canadian crude. Koch officials have attempted to locate non-Canadian heavy crude that can be processed at a profit, but are having limited success in locating such oil.

Light and medium crude is, however, readily available on the spot market. Yet Canadian oil is significantly less expensive to Koch than is Arab Light, one of the more economical and available potential substitutes. Koch Exhibit 12 demonstrates that per barrel, the penalty for substituting Arab Light for Canadian crude would be $1.08 for the fourth quarter of 1978, $9.64, $11.28, and $13.65 for the second, third, and fourth quarters of 1979, respectively, and $6.23 for the first quarter of 1980, the quarters in which Koch's first priority status is disputed.

These penalty figures are, of course, merely comparative; it does not necessarily follow that reduced profitability is equivalent to unprofitability. However, in Koch's case, the economic penalty makes it more economical to decline to obtain substitutes for the Canadian oil lost.

The Court found persuasive the testimony of John D. Roper, Koch's Executive Vice President, and William P. Hougland, President of Koch Oil and also Executive Vice President of Koch Refining, to the effect that the Koch refinery cannot replace Canadian oil and still operate in an economically feasible manner. As Roper put it, "If you take another 8,000 [B/D of Canadian oil] from us or 18,000 . . . that's just that much less we are going to run in today's world, today's economics. That's what happens. That's my judgment." Tr. 342–343.

The credibility of this testimony is supported by two factors. First, Koch has in the past cut its refinery runs due to the cost of oil. Its refinery currently runs at 17,000 B/D below its 127,000 B/D capacity. Koch does not currently utilize all of the available space for the shipment of crude on the Williams Pipeline. As Roper testified, "the reason we are not running at 125,000 barrels a day is that the next 15,000 barrels a day with the slate that we have is a loser. We lose money." Tr. 342. Hougland testified that the refinery cut runs several years ago because of the cost of crude oil. Tr. 205. Historically, Koch operates in accordance with the laws of economics; it processes oil if profits result, and declines to process without profit.

Second, Koch cannot pass on any relatively significant increases in crude costs. Koch competes in the Minnesota market with the Ashland, Murphy, and Continental refineries. Refined products are shipped into Minnesota from Chicago and from Kansas. Also, Koch engages in wholesale exchanges with companies located in the South and on the East Coast. These com-

panies arrange to supply their Midwest service stations with refined products produced by Koch and Koch receives refined products located elsewhere. Therefore, Koch competes in a national market and its ability to pass on costs is limited by that fact. The evidence therefore suggests that reclassification of Koch would reduce Minnesota's crude oil supply because Koch would reduce its output by between 15,000 and 18,000 B/D, even if it could obtain substitutes for Canadian oil.

Although Ashland did not make an evidentiary presentation similar to that of Koch, the Court has concluded that Ashland is in a position similar to that of Koch and is likewise deserving of a preliminary injunction. The Ashland refinery attained its present size and configuration at a time when Minnesota refineries expected that Canadian oil would continue to be available as an important source of supply for the indefinite future. Although Ashland processes, on a percentage basis, much more light crude than does Koch, heavy Canadian crude has been and continues to be an important part of Ashland's total crude oil supply. For example, as recently as May of 1980 Ashland received 11,000 B/D of Canadian crude, and received up to 30,000 B/D from October, 1979, to February, 1980. Thus, the fact that Ashland received only 4,112 B/D in June, 1980, and 2,558 B/D in July, 1980, does not mean that Ashland is not substantially dependent on Canadian crude.[18]

If, as it appears likely, Canada exports approximately 38,000 B/D during the third quarter and approximately 70,000 B/D during the fourth quarter of 1980, Ashland would lose between 953 and 1,022 B/D for the third quarter and approximately 1,436 B/D for the fourth quarter if both it and Koch were reclassified. Koch Exhibit 11. If Koch were to remain a first priority

refinery and Ashland were reclassified, it appears that Ashland would lose every barrel of its Canadian oil.[19]

With respect to the economics of production, both the Koch and Ashland refineries historically have relied on Canada as the source of a significant share of their total crude oil supply. Both compete in the same geographic area. The two refineries are located within a few miles of each other, and obtain both Canadian and non-Canadian oil through identical delivery methods. It may be deduced that like Koch, Ashland would need 45 days in which to secure alternative sources of crude. These factors suggest that if Ashland does not receive Canadian oil, the impact upon the State of Minnesota and other consumers, discussed *infra*, will be the same on a per-barrel basis as a reduction in Canadian oil allocated to Koch.

The reclassification of Koch and Ashland and the probable subsequent cutbacks in production would cause substantial and irreparable injury to the state and citizens of Minnesota. The testimony at the preliminary injunction hearing focused exclusively on the impact of a shortfall of heating oil, one of the distillate products of crude oil. The economic impact upon the state of a shortage of heating oil cannot be precisely predicted; a number of variables, including the average winter temperature, the amount of Canadian natural gas exported, and the success of conservation efforts, affect the energy/industrial output relationship. However, the Minnesota Energy Agency demonstrated at the preliminary injunction hearing that a shortage of oil would have a significant impact upon the State of Minnesota in a proprietary capacity and upon the state's citizens.

The Court is particularly concerned with the effects a heating oil shortfall could have on the institutions and services of the State

18. Rather, the diminishing amounts allocated to Ashland are partially related to the reduced level of Canadian exports.

19. If Koch and Ashland were redesignated as second priority refineries, the Ashland refinery in Minnesota could conceivably receive more oil than it could obtain as a first priority refin-

ery if Ashland's three refineries nominated for Canadian oil and Ashland sent all of this oil to its Minnesota facility. Because the Court believes that Koch is entitled to a preliminary injunction, this possibility need not be discussed.

of Minnesota. The state is Minnesota's largest single consumer of #1 and #2 fuel oil for heating. A shortage of heating oil could lead to the closings or curtailment of use of many of the state's buildings. Although it is difficult to predict which buildings would be affected, the affidavit of Mark Mason, Director of the MEA, states that hospitals, nursing homes and sanitariums, state college and university buildings, National Guard armories, and buildings used by the Departments of Transportation and Natural Resources would be affected. The validity of these statements is underscored by the fact that the state declared an energy emergency in 1976–77 during which state services were significantly curtailed.

Although the Court finds that the MEA's computerized input/output model is by no means a perfect method of forecasting the economic effects of a shortage of heating oil, the model's conclusions are of some help to the Court. An analysis by the MEA indicates that the reclassification of Koch and Ashland could reduce Minnesota's industrial output by approximately $1 billion. Such a reduction could lead to the unemployment of approximately 70,000 persons. The state would lose sales and income tax revenues in the event of declines in industrial output. Even if these estimates are significantly overstated, the potential for irreparable harm clearly exists.

Thus, the factors of irreparable harm to the plaintiffs and the public interest militate in favor of the granting of an injunction against the reclassification of Koch and Ashland.

*Inconvenience to the Opposing Parties*

In contrast to the probability of irreparable harm to Koch, to Ashland, to the State of Minnesota, as a proprietor, and to the state's citizens, there has been no contention that either the Department of Energy or Mobil will be inconvenienced during the period pending a final decision on the merits. The DOE is, of course, interested in the outcome of the case, but neither it nor its regulatory program would be injured if Koch and Ashland are not immediately reclassified. Mobil has never contended that

it lacks access to crude oil or that it may be forced to reduce its refinery runs without additional Canadian crude. Also, there has been no showing by the DOE or Mobil that a preliminary injunction would inconvenience third parties or cause any injury to the public interest.

*The Merits*

The Court believes that plaintiffs have a strong chance to prevail on the issue of whether the OHA erred in holding that the ERA had no authority to consider equitable factors in redesignation determinations. The Court expresses no opinion at this time on the merits of any of the other issues in the case.

The CAP regulations grant the ERA authority to change initial priority designations. 10 C.F.R. § 214.34 provides in relevant part:

(a) *Supplemental affidavits and changes in initial designation.* Refiners and other firms that own or control priority refineries shall correct any errors contained in affidavits filed pursuant to Subpart D of this part by filing a supplemental affidavit pursuant to § 214.41(b). Affidavits shall be so supplemented to reflect any changes in the access of the refiner or other firm to alternative sources of crude oil. Based on information set forth in any such supplemental affidavit or in any affidavit filed after February 10, 1976, the DOE *may* change its initial priority designation as to a refinery or other facility, *may* determine that a particular refinery or other facility is no longer eligible to receive Canadian crude oil rights under this part or *may* make an initial priority designation as to that refinery or other facility. Any such action taken by the DOE under this paragraph (a) may be based, in whole or in part, on information available to the DOE from sources other than the affidavits filed pursuant to Subpart D of this part.

(emphasis supplied)

Koch, Ashland, and the State of Minnesota contend that this regulation allows ERA to use its discretion in considering whether to change a priority designation, while Mo-

bil and the DOE argue that the ERA must reclassify a refinery once it obtains sufficient physical access to non-Canadian crude, the factor used in the initial designations pursuant to 10 C.F.R. § 214.33. In the Court's view, plaintiffs' approach is more likely to prevail.

As with any statute or regulation, the starting-point is the wording of the regulation itself. It provides that the DOE "may" change its initial designation. "May" is a permissive word, *Burglin v. Morton*, 527 F.2d 486, 488 (9th Cir. 1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976), and will be construed to vest discretionary power, unless the context of its use clearly indicates a purpose to use it in a mandatory sense. *United States v. Bowden*, 182 F.2d 251, 252 (10th Cir. 1950).

The term "shall" is used in the CAP regulations when a mandatory duty is imposed upon the DOE. *See* 10 C.F.R. §§ 214.31(a), (b), (i); 214.32(b), (d); 214.-33(a), (b); 214.35. Where a term is employed in one part of a regulation and is excluded in another, it should not be implied where excluded. *Diamond Roofing Co., Inc. v. Occupational Safety & Health Review Commission*, 528 F.2d 645, 648 (5th Cir. 1976). Specifically, where the words "shall" and "may" are used in the same statute or regulation, "shall" is usually interpreted to impose a mandatory obligation and "may" is usually interpreted to grant discretion. *Farmers' & Merchants' Bank v. Federal Reserve Bank*, 262 U.S. 649, 662–63, 43 S.Ct. 651, 656, 67 L.Ed. 1157 (1923) (Brandeis, J.); *Publix Oil Company v. Department of Energy*, CIVIL 2–80–73 (E.D. Tenn. July 19, 1980).

Applying the rules of construction to this case, § 214.34 should be interpreted to mean that the ERA has the discretion to redesignate a refinery when affidavits indicate that a refinery has access to alternative sources of crude oil, but that it is under no obligation to do so. This interpretation is buttressed by the facts that § 214.34 neither contains specific criteria for redesignation nor mentions § 214.33 or the criteria for initial designation contained therein.

The OHA Decision and Order rejected this interpretation on the ground that

[t]he term "may" is used to indicate that the ERA may on the basis of the information available to it take one of three actions. If "shall" had been used instead of "may" the provision would have been meaningless—it would have directed the ERA to take three contradictory actions. Thus, the term "may" was not used to give ERA discretion to ignore the specific criteria set forth in the CAP regulations, but rather was used to convey the options available to ERA when a refiner's access to non-Canadian crude oil changes.

Decision and Order at 18.

While, on the face of it, the OHA argument appears to have some merit, it seems clear that the regulation gives the ERA substantial discretion. The three courses of action listed in the regulation obviously are not the only actions the ERA may take in response to information supplied to it. If the information shows insufficient access to non-Canadian crude oil under § 214.21, the agency may decline to redesignate a first priority refinery. If the information shows that a refinery is not eligible to participate in the CAP, the ERA may decline to make an "initial priority designation." No one would claim that the ERA could not take those courses of action; yet they are not identified in the regulation. Similarly, and most significantly, the ERA should be able to maintain the status quo when such a course of action is dictated by a consideration of all the facts and circumstances, including equitable considerations.

Ordinarily, courts will give great weight to an agency's interpretation of its own regulations. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1400 (Em. App.1975). However, this principle does not justify giving substantial weight to the OHA's interpretation of § 214.34, for two reasons.

First, the agency interpretation is entitled to less deference when it does not

comport with the conclusion dictated by established principles of statutory construction. *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027 (D.C.Cir.1978); *Marathon Oil Co. v. Kleppe*, 556 F.2d 982, 985–86 (10th Cir. 1977); *Getty Oil Co. v. Department of Energy*, 478 F.Supp. 523, 527 (C.D.Cal.1978). In this case OHA's interpretation is at odds with the clear and understandable language of the regulation. *Marathon Oil Co., supra.* It "simply cannot be regarded as a defensible reading of the regulation in question," *Standard Oil Co. of Ohio v. Federal Energy Administration*, 612 F.2d 1291, 1297 (Em. App.1979). The Court declines to employ legerdemain to transform the word "may" into the word "shall."

■ Second, the principles embodied in the Emergency Petroleum Allocation Act, 15 U.S.C. § 753(b)(1), militate in favor of a reading giving discretion to the ERA. The EPAA outlines nine objectives to be pursued by the DOE when promulgating its regulations. DOE's interpretation, which would have the effect of reducing the access of Koch and Ashland, two small and/or independent refiners, to Canadian oil, does not fully consider these objectives.[20] Reclassification in this case would undermine the following statutory goals:

(B) maintenance of all public services (including facilities and services provided by . . . any State or local government . . .);

(D) . . . to preserve the competitive viability of independent refiners, small refiners . . .;[21]

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States

and sectors of the petroleum industry, including independent refiners, small refiners . . . and among all users . . . .

15 U.S.C. § 753(b)(1). When the regulation is read against the background of the EPAA, the most reasonable interpretation is one which allows the ERA discretion to forego reclassification when to do so would not be in harmony with the purposes of the Act.

■ The Court recognizes that the EPAA objectives are not necessarily mutually obtainable and that they must be balanced. *Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796, 801 (Em.App.1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Amtel, Inc. v. Federal Energy Administration*, 536 F.2d 1378, 1383 (Em.App.1976); *Consumers Union of U. S., Inc. v. Sawhill*, 525 F.2d 1068, 1072 (Em.App.1975). However, the agency interpretations of a statute should strive to carry out the congressional policy underlying the statute, *see Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission*, 390 U.S. 261, 273–75, 88 S.Ct. 929, 936–937, 19 L.Ed.2d 1090 (1968). In this case, plaintiffs' interpretation is more consistent with the critical, congressionally-mandated goals of the EPAA. *Cf. Standard Oil Co. of Ohio v. Federal Energy Administration*, 612 F.2d 1291, 1296 (Em. App.1979).

Defendants strenuously contend that the plaintiffs' and the ERA's interpretation of § 214.34 would render superfluous DOE's "exceptions" procedures, established pursuant to 42 U.S.C. § 7194(a). 10 C.F.R. § 205.50

establishes the procedures for applying for an exception from a regulation, ruling or generally applicable requirement based on an assertion of serious hardship or gross inequity and for the consideration of such application by the DOE. . . .

---

**20.** The Court here does not reach the question of whether the regulation as interpreted by the OHA actually conflicts with the goals of the EPAA.

**21.** The goal of protecting small and independent refiners has been recognized in several

cases. *See Husky Oil Co. v. Department of Energy*, 582 F.2d 644, 650 (Em.App.1978); *Mobil Oil Corp. v. Federal Energy Administration*, 566 F.2d 87, 96–97 (Em.App.1977); *Ashland Oil Co. of California v. Federal Energy Administration*, 389 F.Supp. 1119, 1126 (N.D.Cal.1975).

Defendants argue that if the ERA may consider serious hardships and gross inequities in redesignation decisions the OHA, which hears exceptions requests, would have no exceptions responsibility.

Defendants' analysis puts the cart before the horse. If § 214.34 must be read as according the ERA discretion to consider equitable factors, as the Court thinks it must, then there may be no need for the exceptions procedure with respect to redesignation decisions. Rather, an aggrieved party may simply appeal the ERA's decision pursuant to relevant provisions of 10 C.F.R. § 205, just as Mobil appealed the ERA's decisions in this matter. Further, the Court refuses to allow a rather amorphous regulatory scheme to control its decision as to how the regulation should be interpreted.

The Court thus believes that plaintiffs have shown a substantial likelihood of success on the merits with respect to the interpretation of 10 C.F.R. § 214.34.

*Conclusion*

The Court therefore finds that immediate and irreparable harm will occur to Koch, Ashland, and the State of Minnesota if a preliminary injunction is denied. It further finds that the inconvenience to the DOE, to the other federal defendants, and to Mobil is minimal. The Court also finds that plaintiffs have shown a substantial likelihood of success on the merits and that the public interest would be furthered by the granting of a preliminary injunction.

*Order*

Accordingly,

IT IS ORDERED that:

1. The federal defendants, their officers, employees, agents, servants, and attorneys, and all other individuals and entities in active concert or participation with them are restrained and enjoined from taking any action pursuant to the OHA Decision and Order, dated April 17, 1980, in the case entitled *Mobil Oil Corporation, No. BEA–0035, et al.*, until the entry by this Court of its final order in this proceeding.

2. Specifically, and without limiting the generality of the foregoing, the federal defendants shall not, until the entry of this Court's final order herein, reclassify or take any action preparatory to or in contemplation of a reclassification of the refinery operated by plaintiff Koch Refining Company at Pine Bend, Minnesota, or the refinery operated by plaintiff-intervenor Ashland Oil, Inc., at St. Paul Park, Minnesota, from first to second priority status under the regulations of the Canadian Crude Oil Allocation Program, 10 C.F.R. § 214.